2014 VT 21

# Richard Madowitz, Benedict Kohl as Co-Executor of the Estate of Douglas Kohl and Amherst Realty, LLC v. The Woods at Killington Owners' Association, Inc.

[93 A.3d 571]

No. 12-320

Present: Dooley, Skoglund and Burgess, JJ., and Zonay and Zimmerman (Ret.), Supr. JJ., Specially Assigned

Opinion Filed February 28, 2014

*Mitchell L. Pearl* of *Langrock Sperry & Wool, LLP*, Middlebury, and *John E. Garber* of *Weinberg & Garber, P.C.*, Northampton, Massachusetts, for Plaintiffs-Appellants.

*Allan R. Keyes* and *James B. Anderson* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Defendant-Appellee.

¶ 1. **Dooley, J.** Appellants Amherst Realty, LLC, Richard Madowitz, and the personal representatives of the Estate of

Douglas Kohl (collectively, Amherst Realty) appeal a decision of the superior court granting summary judgment to The Woods at Killington Owners' Association (Association) on Amherst Realty's claim of breach of contract based on the Association's alleged interference with its development rights at The Woods at Killington. The Association cross-appeals the superior court's decision granting summary judgment to Amherst Realty on the Association's consumer fraud counterclaim. We affirm both decisions.

¶ 2. This is the second time that we have ventured into the conflict between these parties. The background to the dispute is described in detail in *Madowitz v. The Woods at Killington Owners' Ass'n* (*Madowitz I*), 2010 VT 37, ¶¶ 2-8, 188 Vt. 197, 6 A.3d 1117, which came to us on interlocutory appeal from the superior court's grant of partial summary judgment. The basic facts can be summarized as follows. The Woods at Killington is a condominium development created by a declaration of condominium filed on July 25, 1985. Condominium units were conveyed to private owners beginning in 1985. The original declaration of condominium, as well as an amended declaration from 1988, included a limited power of attorney provision whereby unit owners gave prior consent for the developer to amend the declaration to change the unit owner's percentage of undivided interest in the common areas by adding additional units. The original plan provided for 147 condominiums and residential homes, but only 107 were built initially. This case is about the consequences of the attempt and ultimate failure to build the other 40 units.

¶ 3. The deeds to 105 of the units also contained a power of attorney provision, but it was limited in duration to ten years.[1] As noted in *Madowitz I*, this created a conflict between the terms of the declaration and the terms of the deeds as to the developer's right to continued development after the ten years expired. 2010 VT 37, ¶ 3.

¶ 4. The original developer, Killington 43 Associates, Inc., was foreclosed upon. Probos, Ltd. acquired the development rights. Amherst Realty then acquired the rights in 1994,[2] and applied for

---

[1] In addition, two unit owners executed separate limited powers of attorney consenting to future development. In total, 107 units were conveyed.

[2] In fact, Richard Madowitz and Jack Phelan acquired the rights in 1994, and Phelan transferred his interest to Douglas Kohl in 1996. Kohl died, and his interest

an amendment to extend the construction completion date of the existing Act 250 permit for the development to January 1, 2000. The Association did not take part in the proceeding, and the application was granted in June 1995. Throughout the late 1990s, Amherst Realty proceeded with its development plans, even as the ten-year window for development provided for in the deeds ticked away and conflict between the Association and Amherst Realty developed.[3] In June 1998, a representative of the Association informed a contractor for Amherst Realty that he was trespassing, directing him to stop his work on infrastructure for additional units and to leave the property. This incident prompted a series of negotiations between the parties over the following years, but no agreement was ever reached. The Association continued to oppose the development, generally refusing to cooperate with Amherst Realty and its contractors.

¶ 5. Just before the January 1, 2000 deadline for construction completion under the Act 250 permit, Amherst Realty applied for another extension, and the Association opposed that application. The District Environmental Commission denied the amendment application, finding that Amherst Realty had failed to show that it had adequate development rights or that the Association should not have been joined as a co-applicant. In 2002, Amherst Realty filed a complaint in the superior court, seeking a declaratory judgment regarding the scope of its development rights and damages for lost profits for the Association's alleged interference with its development rights under the condominium declaration,[4] which it characterized as a breach of contract — the contract being the condominium declaration as amended in 1988. In 2008, the superior court granted partial summary judgment to Amherst

---

went to the executors of his estate, who were substituted as parties in October 2010. In January 2011, Amherst Realty, LLC was added as a party because the development interest and property in The Woods at Killington had been transferred to it. The motion asserted that Amherst Realty was owned entirely by the other plaintiffs. In fact, the record indicates that the transfer occurred in 1999. For convenience, we use "Amherst Realty" to refer to all plaintiffs even before this assignment, except where otherwise indicated.

[3] The conflict between the parties was not limited to the issue of development rights under the deeds, and Amherst Realty asserts in its brief that the Association did not raise that issue until litigation commenced. This is immaterial for the purposes of this appeal.

[4] Plaintiffs never sought an injunction in this litigation to allow its contractors and staff to continue construction activities.

Realty on the declaratory judgment claim, concluding that the power of attorney and consent provisions controlled over the language of the deeds. On interlocutory appeal, relating only to the declaratory judgment decision, this Court affirmed.

¶ 6. The superior court also denied Amherst Realty's motion for summary judgment on the interference claims. With respect to the claim that the Association breached its duties in the condominium declaration by opposing the extension of the Act 250 permit beyond January 1, 2000, and seeking the reopening of the 1995 extension, the court ruled:

> The Association has the right, as the legal representative of the unit owners and/or as a unit owner in its own right, to come before the Environmental Commission to raise pertinent issues. Although the Association has not prevailed in its claim with respect to the legal effect of the ten-year limitation provision, its claim was not a frivolous claim, conjured up solely for purposes of delay. Indeed, the Plaintiffs' predecessors created the conflict between the Declaration and the deeds by the terms of the deeds they delivered. Because of the conflicting terms, the Association's position was not clearly untenable.

> Plaintiffs have not shown a legal basis for liability for damages for interference with their claimed rights where the claimed wrongful act is the Association's attempt to exercise and enforce rights and terms contained in the deeds of its members. Finding liability on this basis would have a serious chilling effect on an owners' association right to press a patently colorable claim before administrative agencies and the courts.

With respect to the claim that the Association violated Amherst Realty's rights under the condominium declaration by claiming that its contractor was trespassing, the court concluded that "[t]he record regarding this claim is not sufficient to support a summary judgment ruling of liability on the part of the Association for such interference."

¶ 7. Following the interlocutory appeal to this Court, the superior court granted the Association's motion to amend, allowing it to add a consumer fraud counterclaim. The trial court then

disposed of the remaining claims on summary judgment. It granted the Association's motion for summary judgment on the claim for damages for interference with development rights and granted Amherst Realty's motion for summary judgment on the consumer fraud counterclaim. The court denied Amherst Realty's motion for relief from judgment or for reconsideration of the claim that was decided against it.

¶ 8. Amherst Realty now appeals the trial court's 2012 grant of summary judgment against it. The Association cross-appeals the summary judgment against it on the consumer fraud counterclaim. Amherst Realty has not appealed from the superior court's decision granting the Association summary judgment on Amherst Realty's claim that the Association was liable for appearing before the district commission to oppose the extension of the Act 250 permit. Nor has Amherst Realty appealed the summary judgment against it with respect to damages other than lost profits.[5]

¶ 9. Both the appeal and the cross-appeal concern decisions granting summary judgment. We review a summary judgment order using the same standard as the trial court. *Vt. Small Bus. Dev. Corp. v. Fifth Son Corp.*, 2013 VT 7, ¶ 12, 193 Vt. 185, 67 A.3d 241. Summary judgment is appropriate when, taking all allegations made by the nonmoving party as true, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. V.R.C.P. 56(a); *Vt. Small Bus. Dev. Corp.*, 2013 VT 7, ¶ 12.

¶ 10. We begin with the appeal of the trial court's decision granting summary judgment to the Association on Amherst Realty's interference claim. The trial court declined to read the condominium declaration as containing any affirmative duties that could lead to breach of a specific contract provision, and so characterized Amherst Realty's claim as one for breach of the general covenant of good faith and fair dealing. The court noted that it had already ruled in its 2008 summary judgment order that the Association was not liable for opposing the extension of the Act 250 permit, but that it had specifically left open the

---

[5] Amherst Realty's statement of disputed facts submitted in opposition to the Association's motion for summary judgment stated that substantial infrastructure work and engineering had been completed when the Association's alleged trespass claim arose. The trial court dismissed Amherst Realty's claim for these damages as well as for lost profits, although these damage claims are not discussed in the summary judgment decision.

possibility of liability for the 1998 trespass incident in that decision.[6] It also acknowledged Amherst Realty's more general claim that the Association was liable for "thwarting additional development, specifically by insisting on a resolution of the development issues before allowing [Amherst Realty] to proceed with development." Ultimately, however, the trial court did not definitively rule on whether the Association's behavior constituted a breach of contract, finding instead as a matter of law that no damages could be assessed against defendants because the damages were speculative, based primarily on the fact that Amherst Realty was a "new business" with no history of profits in Vermont.

¶ 11. On appeal, Amherst Realty objects to that decision, arguing specifically that the new business rule should not inflexibly bar all recovery for lost profits, and, in any event, it should not be applied to Amherst Realty. The Association, besides arguing for the continued validity of the new business rule as traditionally understood, reasons that due to the "law of the case" principle, the 2008 summary judgment decision finding no liability for opposing the Act 250 permit extension[7] precludes a damages claim for anything other than the 1998 trespassing incident and further precludes a damages claim for any period post-2000, when the extension of the permit was denied. As for the 1998 incident, which the Association claims is covered by the "litigation privilege" because it was essentially a threat to litigate, the Association points out that Amherst Realty has presented no evidence of damages at all for the years 1998-2000. Amherst Realty, in reply, argues that notwithstanding the trial court's statement in its most recent order that it had already "ruled" on this issue, the 2008 order was only a denial of summary judgment and therefore does not constitute the law of the case. See *supra* note 6. It also

---

[6] Although the court stated in its 2008 decision that Amherst Realty "ha[s] not shown a legal basis for liability for damages for interference with [its] claimed rights where the claimed wrongful act is the Association's attempt to exercise and enforce rights and terms contained in the deeds of its members," it was in the context of denying a motion for summary judgment by Amherst Realty. It is therefore confusing to say that the trial court "ruled" on this issue, despite the clear position of the trial court reflected in those words. We likely contributed to this confusion when we stated in our 2010 opinion on the declaratory judgment that "the court found in favor of the Association with regard to its cross-motion for summary judgment, concluding that the Association was not liable to developers for its participation in the Act 250 proceeding." *Madowitz I*, 2010 VT 37, ¶ 7.

[7] See *supra* note 6.

emphasizes that the interference claim is, in any event, not based on the Association's opposition to the Act 250 permit extension, but rather on the 1998 incident, as well as the Association's general opposition to and noncooperation in Amherst Realty's attempts to exercise its development rights.

¶ 12. Like the trial court, we evaluate whether Amherst Realty is able to prove damages for lost profits — assuming without deciding that the Association's behavior could lead to liability for breach of contract or of the covenant of good faith and fair dealing. In doing so, we first narrow the question by specifying the profits that are potentially at issue. Because the superior court ruled that the Association could not be liable for opposing the extension of the Act 250 permit and Amherst Realty has not contested this ruling on appeal, and because the district commission denied that extension, the only damages at issue relate to construction that would have been completed by January 1, 2000 under the existing permit. That deadline is contained in condition 5 of the 1995-2000 Act 250 permit[8]: "All construction and site work associated with this project shall be completed in accordance with the approved plans by January 1, 2000, unless an extension of this date is approved in writing by the Commission." The permit's construction completion date is also discussed in our earlier decision. *Madowitz I*, 2010 VT 37, ¶ 4. The extension referenced in the condition is what Amherst Realty unsuccessfully sought in its application.

¶ 13. Under the permit condition, it does not matter when the additional units would be sold, or when construction was commenced, as long as the construction was completed by January 1, 2000. Since the incident that Amherst Realty claims triggered liability occurred in June of 1998, Amherst Realty's profits are limited to the sale of units built in that roughly eighteen-month window.

¶ 14. ■ With that background in mind, we turn to the applicable law. The rule is clearly established in Vermont that breach-of-contract damages must be proved with "reasonable certainty." *Ferrisburgh Realty Investors v. Schumacher*, 2010 VT 6, ¶ 22, 187 Vt. 309, 992 A.2d 1042; see Restatement (Second) of Contracts § 352 (1981) ("Damages are not recoverable for loss

---

[8] The permit was attached to the Association's motion for summary judgment of February 25, 2008 as Attachment E.

beyond an amount that the evidence permits to be established with reasonable certainty."). Such damages therefore cannot be based on mere "speculation and conjecture." *Pinewood Manor, Inc. v. Vt. Agency of Transp.*, 164 Vt. 312, 318, 668 A.2d 653, 657 (1995); see also *Hedges v. Durrance*, 2003 VT 63, ¶ 12, 175 Vt. 588, 834 A.2d 1 (mem.) ("An injury based on speculation about uncertain future events is no injury at all."); *Bourne v. Lajoie*, 149 Vt. 45, 53, 540 A.2d 359, 364 (1987) (rejecting plaintiff's damages claim for a lost opportunity as "based only on her speculation that she would have been able to sell the property, rather than on evidence of an actual offer from a prospective purchaser which she was unable to pursue").

¶ 15. ■ Courts rely upon the reasonable certainty standard when a business is seeking damages for lost profits. See *Berlin Dev. Corp. v. Vt. Structural Steel Corp.*, 127 Vt. 367, 372-73, 250 A.2d 189, 193 (1968); see also Restatement (Second) of Contracts § 352 cmt. a ("The main impact of the requirement of certainty comes in connection with recovery for lost profits."). We explained our rule in *Berlin Development Corp.*: "The general rule is that evidence of expected profits from a new business is too speculative, uncertain, and remote to be considered and does not meet the legal standard of reasonable certainty." 127 Vt. at 372, 250 A.2d at 193. Consequently, "recovery for lost profits is not generally allowed for injury to a new business with no history of profits." *Id.* The superior court held that because Amherst Realty was a new business with no history of profits, its losses were too speculative and it could not recover lost profits. On appeal, Amherst Realty urges us to abandon or modify the way we apply the reasonable certainty rule to new businesses and argues that, even if we apply our existing law, it is not a new business and other factors should control.

¶ 16. ■ We need not address Amherst Realty's arguments regarding the new business rule because Amherst Realty faces a more fundamental barrier to recovery of business profits, which is that any such profits are entirely speculative. Although Amherst Realty purchased the development rights to the property in 1994, it did not take any immediate development action. The record indicates that by the time of the 1998 incident, Amherst Realty had engaged in planning for development and done some site work, but had not engaged in any building construction. One of the

Association's statements of undisputed facts, admitted by Amherst Realty,[9] was that "Plaintiff's calculation of lost profits . . . is based on constructing the 40 units during 2000, 2001, 2002, 2003 and 2004. Plaintiffs' construction costs do not include any units constructed before January 1, 2000."

¶ 17. In his deposition, Richard Madowitz said it would take three to five years to build the forty units and "we would stagger our development based on sales absorption and be driven by market forces in terms of intensity of construction and development." He said that the plan was to start the infrastructure in 1998 and determine thereafter when to start construction.

¶ 18. The record contains evidence of a plan for the immediate construction of only two of the forty units with construction to commence in the spring of 1999.[10] However, it also shows that the local building permit for one of the units was obtained only in November of 1999.

¶ 19. Based on this record, it is entirely speculative that Amherst Realty would have completed, or even started, any construction before the Act 250 permit expired on January 1, 2000. Even if the record supported a finding that Amherst Realty would have commenced or completed some construction, the number of units that could have been constructed under the Act 250 permit is also entirely speculation.

¶ 20. Amherst Realty responds to the above record evidence by noting that Amherst Realty appealed the district commission's permit extension denial to the Environmental Board, which granted a continuance to allow the parties to litigate whether Amherst Realty had the right to develop the additional units. Its point, as we understand it, is that the absence of a permit is no barrier to Amherst Realty obtaining the lost profits as damages

---

[9] Amherst Realty filed both a response to the Association's statement of undisputed facts and a statement of disputed facts. We are relying on the response because it directly responded to the Association's fact statement. We interpret the statement of disputed facts to explain, and show support for, the instances where Amherst Realty contested that a fact that was alleged as undisputed by the Association was disputed. The statement of disputed facts is irrelevant to our analysis because we rely only on facts that Amherst Realty admitted were undisputed.

[10] Amherst Realty hired a sitework contractor, Richard Moore. In his deposition, Moore said he was hired in 1998 "[t]o clear the two sites and to put the sewer line in." He said the arrangement with Amherst Realty was to do a limited amount of site work in 1998 and "to sit down during the winter and formalize everything."

because its appeal of the permit denial was continued until the resolution of *Madowitz I* in 2010. Thus, Amherst Realty's suspension of construction between 2000 and 2010 — and the associated lack of an Act 250 permit during that time — was immaterial, because to attempt otherwise would have been "futile."

¶ 21. We find the logic of this argument strained. The Association is not liable for its opposition to the Act 250 permit. Nor is it liable for litigating the development rights we determined in *Madowitz I*. Amherst Realty's lack of development during the pendency of that litigation is thus truly irrelevant to its alleged lost profits. More importantly, Amherst Realty never returned to the Environmental Board for the permit extension after *Madowitz I*. If it had received the permit extension, there would have been no barrier preventing Amherst Realty from going forward with its construction and sales plans, earning the profits it claims to have lost. Amherst Realty makes vague claims that the Association would have continued to interfere with those plans and would have obstructed development. We can find no evidence in the summary judgment record to support those claims. We can conclude only that they are based on speculation.

¶ 22. For the above reasons, we affirm the trial court decision that Amherst Realty could not submit a claim of lost profits to the jury, albeit on somewhat different grounds. The claim for lost profits is too speculative to go forward.

¶ 23. ▮ We now turn to the Association's cross-appeal regarding the dismissal of its consumer fraud claim against Amherst Realty.[11] The Vermont Consumer Fraud Act (CFA) prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). The Association brings its claim under the "deceptive" rather than the "unfair" prong. To establish a "deceptive act or practice" under the CFA requires three elements: "(1) there must be a representation, omission, or practice likely to mislead consumers; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision regarding the product." *Carter v. Gugliuzzi*, 168 Vt. 48,

---

[11] The Association seeks a remedy of a "set-off and disgorgement of any damages it owes Plaintiffs for lost profits plus statutory attorneys fees." Because we affirm the trial court's summary judgment order on Amherst Realty's damages claim, the only remedy in play is the award of attorney's fees.

56, 716 A.2d 17, 23 (1998). In addition, to bring a private claim, a plaintiff must meet the requirements of § 2461(b). Namely, the plaintiff must be a consumer who "contracts for goods or services in reliance upon false or fraudulent representations or practices prohibited by section 2453" or "who sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 . . . or prohibited by any rule or regulation made pursuant to section 2453." 9 V.S.A. § 2461(b). The defendant must be a "seller, solicitor, or other violator." *Id.*

¶ 24. The Association's theory is that the original developer violated § 2453 by committing the deceptive act of knowingly putting a legally ineffective durational limit on development expansion in the deeds of condominium purchasers in order to induce them to buy.[12] It then argues that Amherst Realty, as a "successor" developer, received the benefit of the deception in the form of the authority to impose the development expansion, and related common area dilution, on the condominium owners against their will. It characterizes Amherst Realty's action as a ratification of the consumer fraud. It describes the remedy as equitable "disgorgement" of any profits, a form of "equitable relief" authorized by § 2461(b).

¶ 25. In analyzing this argument, we note that the superior court found, and both parties agree, that Amherst Realty did not know of the conflict between the declaration and the deed language when it bought the development rights. The crux of the trial court's decision was that Amherst Realty "did not . . . undertake any activities that could be considered fraudulent within the meaning of the Act," given (1) that it was "undisputedly ignorant of the conflict between the Declaration and the deeds when [it] purchased the development rights," and (2) that attempting to vindicate its rights after discovering the conflict did not constitute fraudulent conduct. The trial court went on to hold that a theory of ratification based on the purchase of development rights is not compatible with the statute. It also held that the Association did not have standing to bring a consumer fraud action; only a condominium owner with a deed containing the durational limit on future development would have such standing.

¶ 26. For purposes of our analysis, we assume without deciding that the initial sale of units did in fact constitute an act of

---

[12] This argument was raised in the dissent in this matter when it came before us on interlocutory appeal. *Madowitz I*, 2010 VT 37, ¶¶ 28-50 (Dooley, J., dissenting).

consumer fraud under § 2453, but we note that there are no allegations that Amherst Realty made misleading communications of its own that could fit the definition of a "deceptive act" as it has been defined in our jurisprudence. Therefore, the only way that Amherst Realty could be liable under the consumer protection act would be if there were some principle under which later, good-faith successors[13] to violators of § 2453 assume consumer fraud liability simply by attempting to exercise the rights that they acquired.

¶ 27. ■ ■ The Association argues that such a principle exists, and refers to it as "ratification." Ratification is a well-known concept of agency law, where "a principal may affirm a prior action by an agent which did not bind the principal but was purportedly done on his or her account, with the ratification 'relating back' to the time of the actual act." *Estate of Sawyer v. Crowell*, 151 Vt. 287, 293, 559 A.2d 687, 691 (1989). We have applied a related theory to situations where a person acting on behalf of another commits fraud:

> [W]here a person acts for another who accepts the fruits of his efforts, knowing the methods used, the later must be deemed to have adopted those methods, as he may not, even though innocent of the fraud when committed, receive the benefits thereof, and at the same time disclaim responsibility for the means by which they arose.

*Jones v. Stearns*, 97 Vt. 37, 42, 122 A. 116, 117 (1923). We explained in *Jones* that "[w]hile this doctrine is most frequently applied in instances where a principal accepts the benefits of his agent's fraud, it is not confined to those cases," and went on to list a number of situations where one person might be acting on another's behalf without being considered an agent in the traditional sense. *Id.* at 42, 122 A. at 118 ("Suppose that A. who is possessed of B.'s horse . . . induces C. to purchase the same by means of false representations as to its soundness or characteristics, and B. with knowledge of the facts, accepts the avails of the sale, can he escape liability for A.'s fraud? Certainly not.").

---

[13] We have used the word "successor" because that is the label used by the Association. Amherst Realty is a successor in the sense that it purchased the development rights of the original developer, but is not in the chain of title to the existing condominium owners and is not a successor to the original developer.

¶ 28. In *Commercial Credit Plan, Inc. v. Beebe*, we applied the principle of ratification in a nonagent context to "the cooperative activities between the plaintiff and [another party], involving the solicitation and acceptance of small loan customers and the binding endorsement and delivery of the loan checks through [the other party]'s organization." 123 Vt. 317, 321-22, 187 A.2d 502, 506 (1963). Never, however, have we extended responsibility for fraud beyond the context of one party acting on behalf of a cooperative effort between multiple parties.

¶ 29. We stress that this case law involves common law fraud, and not liability under the CFA. We need not decide whether it would have any application under the CFA because this theory cannot stretch enough to cover the facts of this case. The original developer was not an agent of Amherst Realty; nor were they in a cooperative venture.

¶ 30. ■ ■ Irrespective of the common-law underpinnings of the Association's theory of liability and consistent with the trial court decision, however, we do not believe that this ratification theory can be maintained under the CFA. The purposes of the Act are to protect citizens in consumer transactions from unfair and deceptive business practices and "to encourage a commercial environment highlighted by integrity and fairness." *Gramatan Home Investors Corp. v. Starling*, 143 Vt. 527, 536, 470 A.2d 1157, 1162 (1983); see also 9 V.S.A. § 2451; *Christie v. Dalmig, Inc.*, 136 Vt. 597, 600, 396 A.2d 1385, 1387 (1979). Holding an innocent purchaser of a right liable for the misconduct of a predecessor owner of that right does not serve to "deter future misconduct, educate consumers or vendors, or promote a more honest and open marketplace." *Anderson v. Johnson*, 2011 VT 17, ¶ 12, 189 Vt. 603, 19 A.3d 86 (mem.). Indeed, the successor to a right acquired by deception is in many respects a victim of the deceptive act, as Amherst Realty discovered when it became enmeshed in litigation with the Association. The Association's theory of disgorgement of ill-gotten profits is difficult to reconcile with the reality that Amherst Realty paid the seller of the development rights a price that necessarily reflected the opportunity for profits from development. We hold that the good-faith purchaser of a right that was initially acquired by a deceptive act under § 2453 does not itself commit a deceptive act by attempting to exercise that right.

¶ 31. ■ In reaching this conclusion, we reject the Association's argument that an earlier decision, *Elkins v. Microsoft Corp.*, 174

Vt. 328, 817 A.2d 9 (2002), supports its theory of liability. In *Elkins*, we held that a private claim under § 2461(b) can be brought against a party with whom the plaintiff is not in contractual privity. *Id.* at 331, 817 A.2d at 12-13. We did not, however, change any of the requirements for consumer fraud under § 2453 or overlook the requirement that a defendant be a seller, solicitor or other violator. Indeed, the point of the decision in *Elkins* is to allow the consumer to reach the person who committed the consumer fraud. *Id.* at 332, 817 A.2d at 14. Here, Amherst Realty did not perpetrate consumer fraud, and thus cannot be held liable for its predecessor's misconduct.

¶ 32. Our holding is consistent with our most recent decision interpreting the CFA. In *Knutsen v. Dion*, 2013 VT 106, 195 Vt. 512, 90 A.3d 866, the Vermont Association of Realtors (VAR) placed on its website, in an area accessible only to member realtors, a template of a real estate purchase and sales form containing a provision that limits the liability of the real estate agent who arranges the sale. The plaintiff purchased real estate, signed the form contract, and later made a claim against her real estate agent — but the contract limited possible damages. She then sued VAR, alleging that the provision in the proposed form contract was unfair and that VAR was an "other violator" under § 2461(b). In affirming the grant of summary judgment against the plaintiff, we noted that liability could not be found against VAR unless it directly participated in the unfair or deceptive act, directly aided the actor, or was in a principal-agent relationship with the actor. *Id.* ¶ 13. In further analysis, we essentially eliminated the second alternative requirement — directly aiding — by requiring that either a principal-agent relationship or some more direct participation also be present for this element. *Id.* ¶¶ 20, 27.

¶ 33. As the superior court concluded in this case, Amherst Realty cannot be held liable as a seller or solicitor. Thus, if liability exists it must be based on a theory that Amherst Realty is an "other violator." In this case, we cannot conclude that Amherst Realty is a violator — it did not directly participate in the violation of § 2453 and was not in a principal-agent relationship with the original developer. While *Knutsen* did not consider a theory based on actions occurring after the misrepresentation was made, we find its analysis inconsistent with the theory of ratification the Association advances.

*Affirmed.*