*U.S. Bank Nat'l Ass'n v. Breer*, No. 717-10-12 Wncv (Teachout, J., Aug. 10, 2017).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**
**Washington Unit**

**CIVIL DIVISION**
**Docket No. 717-10-12 Wncv**

**U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association, as Trustee (s/b/m to LaSalle Bank National Association) as Trustee for Wells Fargo Home Equity Trust Mortgage Pass-Through Certificates, Series 2004-1**
      **Plaintiff**

      **v.**

**Bonnie Breer et al.**
      **Defendants**

### DECISION
### Cross-Motions for Summary Judgment

This is a residential foreclosure action filed by Plaintiff U.S. Bank, N.A., in its capacity as Trustee for Wells Fargo Home Equity Trust Mortgage Pass-Through Certificates, Series 2004-1, against Ms. Bonnie Breer. Ms. Breer has made no mortgage payments since 2011 (including property tax and insurance). She has filed an amended counterclaim alleging fraudulent nondisclosure, constructive fraud, and consumer fraud. She requests damages and a declaration that her note and mortgage are unenforceable. The parties have filed cross-motions for summary judgment.

Ms. Breer asserts fraud related to banking industry practices that, she alleges, manipulated LIBOR to her detriment. She attributes that fraud directly to the U.S. Bank (constructive fraud) and complains that she should have been warned about LIBOR manipulation at the time she took out her loan (fraudulent nondisclosure). She also frames those fraud claims as consumer fraud. Ms. Breer also asserts fraud that is not related to LIBOR. She claims that her lender failed to warn her that it had manipulated her into a predatory loan, that her home is within an alleged spillway easement for Molly's Falls Pond, and that its closing attorney was not her counsel (fraudulent nondisclosure). She also attributes this fraud to U.S. Bank (constructive fraud) and frames it as consumer fraud.

Ms. Breer seeks summary judgment on her LIBOR-manipulation claims, a defective assignment defense, and her unclean hands defense. U.S. Bank seeks summary judgment on Ms. Breer's non-LIBOR fraud claims.

Background[1]

Ms. Breer and her ex-husband bought and began living at the house at issue in this case in 1999. Because Ms. Breer's credit was poor, they bought it in her ex-husband's name only. When they later divorced, she was awarded the home. She was required, however, to refinance the mortgage loan to put it in her name and get it out of her husband's. Doing so led to the 2004 mortgage loan in dispute here.

Ms. Breer refinanced her ex-husband's loan with an adjustable rate loan from Wells Fargo Home Mortgage, Inc., (WFHMI) in the principal amount of $87,750. According to the terms of the Note, the interest rate was fixed at 8.875% for the first two years. Then, it would reset every six months on specified "change dates." Each reset rate would be 7.5% plus the most recent six-month U.S. dollar-denominated LIBOR (London Interbank Offered Rate) published in the Wall Street Journal. The first reset rate could not exceed 11.875%. Thereafter, it could not exceed 14.875%. It could never go below 8.875%, and it could never go up or down more than 1% at a time after the first change date. The terms of the loan permitted her to refinance or otherwise prepay without penalty after the first two years, coinciding with the first rate reset.

U.S. Bank's expert explains that "LIBOR is an interbank lending rate that is commonly used as an index and for the settlement of various types of legal-financial contracts, including ARMs." Report of Timothy J. Riddiough, Ph.D. at 3 (filed Aug. 24, 2015). It is determined based on submissions from selected panel banks. *Id*. at 7. A component of the relevant LIBOR is the six-month Treasury rate. *Id*. at 3. WFHMI has never been a panel bank. Bank of America, N.A., (BANA) was a panel bank at all times relevant to this case. *Id*. at 8.

Once Ms. Breer's loan was originated, WFHMI endorsed the Note in blank and assigned it to a trust, Wells Fargo Home Equity Trust Mortgage Pass-Through Certificates, Series 2004-1 (the Trust), where it was securitized with over 6,600 other residential mortgage loans from around the country. WFHMI has acted as servicer for the Trust ever since. LaSalle Bank, N.A., was the original Trustee and holder of the Note following securitization. In 2007, BANA acquired LaSalle Bank and became the Trustee. In 2009, WFHMI purported to assign Ms. Breer's mortgage to BANA. In 2011, U.S. Bank, N.A., became the Trustee. In 2012, WFHMI purported to assign Ms. Breer's mortgage to U.S. Bank by what it labeled a "Corrective Assignment of Mortgage." WFHMI, LaSalle, and BANA are not parties to this case.

*Non-LIBOR fraud allegations*

Ms. Breer alleges that, in the course of applying for her loan, she came to believe from speaking to someone on the telephone at WFHMI that, despite her low credit rating, she would

---

[1] Many of the background facts of this case are undisputed. Many of the material facts necessary to Ms. Breer's claims and defenses are clearly disputed or the evidence about them is vague or undeveloped such that they otherwise would properly be treated as disputed for purposes of her motion. For example, she asserts that in the course of obtaining her original loan, she was led to believe that she would get a 30-year loan at a very favorable fixed rate despite the fact that her credit was very poor. Her sole evidence in support of that allegation is that she vaguely remembers that someone on the phone told her that and she undertakes no effort at showing that she could have qualified for such a loan. Many of the legal issues, however, can be ruled on as a matter of law assuming, for summary judgment purposes only, the truth of the facts as she alleges them.

be getting a fixed rate loan at a very favorable interest rate and that the lawyer representing WFHMI at the closing would help her through the process.  She did not hire her own counsel.  The lawyer for WFHMI arrived at her house with the paperwork for the loan, having never provided it to her before.  Ms. Breer felt rushed and not able to read the paperwork or ask questions.  She allegedly had no idea that she in fact had a variable rate loan indexed to LIBOR that could go up in the future.  Such a loan, she alleges, was inappropriate for her, predatory, and WFHMI should have known it would end in default.  She also alleges that the lawyer told her that she could not refinance the loan for four years without a substantial penalty.  The penalty period actually permitted refinancing at the time of the first reset.

Neither the lawyer nor anyone else at WFHMI advised her at or before the closing that the property was in the spillway for Molly's Falls Pond (the Marshfield Dam) or that Green Mountain Power allegedly has a spillway easement burdening her property, which has flooded several times since 2004.  She alleges that it is worth less than the amount of the loan and may be wholly unmarketable.  Despite being awarded the house in her divorce before she obtained the loan from WFHMI, and having lived in the house since 1999, she claims to have relied on WFHMI's omissions about the house's spillway location in purchasing it.

These allegations form the basis for her non-LIBOR fraud claims.

*LIBOR fraud allegations*

Ms. Breer had the misfortune of taking on an adjustable rate mortgage indexed to LIBOR just as interest rates, and hence LIBOR, were about to start increasing.  Once her rate started to reset, her monthly payment increased substantially.  She did not seek to refinance the loan when the first reset occurred or anytime thereafter.  During relevant times, LIBOR panel banks, or some of them, manipulated LIBOR by submitting inflated data on common reset dates.  Ms. Breer alleges that this caused her resets to occur at a higher rate than they would have otherwise.  By 2009, she was in default.  In May 2009, WFHMI modified her loan by adding the deficiency to principal and fixing the interest rate at 4.875%.  While her loan was no longer indexed to LIBOR, any previously unpaid LIBOR-indexed interest had become part of the principal.  Ms. Breer does not dispute the modification but objects to the portion of the principal that represents augmented LIBOR-related interest. The modification lowered her monthly payment considerably.  Nevertheless, at some point in 2011, she quit making payments (including for taxes and insurance) altogether and has made none since.

BANA was a LIBOR panel bank while it was the trustee of the Trust.  WFHMI never has been.  Ms. Breer alleges that BANA's LIBOR submissions were fraudulently inflated, which in turn inflated LIBOR (in combination with inflated submissions from others) and her reset rates that were indexed to LIBOR.  Though the amount of the alleged inflation—as distinguished from the underlying rates incorporated into LIBOR—is not specifically quantified by Ms. Breer, she alleges that WFHMI, apart from the LIBOR panel banks, caused the underlying interest rates to skyrocket by overwhelming the markets with subprime loans that it knew were destined for default and would destabilize the economy.

These allegations form the basis for her LIBOR fraud claims.

3

*Analysis*

*Non-LIBOR fraud claims*

U.S. Bank argues that all of Ms. Breer's non-LIBOR fraud claims accrued in 2004 at the time of the loan transaction and are long outside the statute of limitation, 12 V.S.A. § 511 (six years). This case was filed in 2012. Mr. Breer's counterclaims were first filed in 2014. Ms. Breer argues that her counterclaims should relate back to the filing of the complaint and she did not reasonably become aware of issues with LIBOR until 2008, approximately 4 years before the filing of the complaint.

U.S. Bank's statute of limitations argument is asserted against Ms. Breer's non-LIBOR fraud claims, which do not materially rely on her LIBOR allegations. These claims accrued at the time of the loan transaction in 2004. They arise out of the terms of the loan and the manner in which the closing was conducted. Ms. Breer reasonably should have been aware of the loan terms at or shortly after the closing. The loan documents clearly explain how the loan is variable, when it resets and how, and sets forth a maximum interest rate. Ms. Breer did not read the loan documents. She admits that she still has not read them. Choosing to never read the loan paperwork was not reasonable and does not insulate her from the effect of the statute of limitations. The terms were fully available for her to discover.

Similarly, Ms. Breer should have been aware of how the closing was conducted when it occurred; she was there. If she was wrongly led to believe that WFHMI's lawyer was there to help her, she clearly found out, as she asserts, that the lawyer did nothing for her at the closing but "paper the transaction." These claims accrued at or around the time of the closing and expired well before the filing of both the complaint and the original counterclaims.

To the extent that Ms. Breer asserts that WFHMI should have disclosed a flood risk that she only learned about much later (potentially within the limitations period), WFHMI had no such duty and there is no evidence that it knew of any such flood risk to disclose. Generally, a lender "does not take on any duty to the borrower when it undertakes an investigation for its own benefit." *Fuller v. Banknorth Mortg. Co.*, 173 Vt. 488, 490 (2001). In this case, if Ms. Breer was confused about whether WFHMI's lawyer's role was to help her, that confusion, according to her representations, should have been resolved at the closing when, she alleges, the lawyer did nothing for her and she could not even ask questions. The evidence does not show that WFHMI stepped out of its role as a lender and undertook obligations on her behalf that might have given rise to a duty.

Moreover, nothing in the record establishes that WFHMI knew that the property was prone to floods or subject to any spillway easement. Instead, WFHMI received a flood zone certification to the effect that the property is *not* in a FEMA flood zone. Ms. Breer asserts that, in the course of this litigation, she hired someone to search the land records and that person found a relevant spillway easement benefiting Green Mountain Power from the 1920s. She does not allege that WFHMI discovered that easement in its own search of the land records or that WFHMI otherwise knew about it. See *id.* at 490 (fraudulent nondisclosure requires that the party

4

with the duty to disclose had the information that was supposed to have been disclosed).  Finally, Ms. Breer presumably knew that the house she had been living in since 1999 was downstream of the Marshfield Dam.  There is no meaningful allegation that WFHMI knew that.  Ms. Breer's information likely was much better than WFHMI's.

WFHMI is entitled to summary judgment on Ms. Breer's non-LIBOR fraud claims.  It is unnecessary to address U.S. Bank's other arguments in favor of summary judgment on these claims.

*The LIBOR fraud claim*

Ms. Breer's principal LIBOR claim is that BANA submitted inflated data as a LIBOR panel bank that, in combination with inflated data from other panel banks, inflated LIBOR and caused her loan to reset at higher rates than it would have otherwise.  This presumably caused her to default on her loan.  BANA is not a party to this case.  The record is wholly unclear how BANA's fraudulent submissions, assuming they occurred, actually influenced the relevant LIBOR and, in turn, the extent that fraud may be responsible for any increase in Ms. Breer's reset rates before her loan rate became fixed.

Ms. Breer's interest rate resets, before the loan rate became fixed, were indexed to LIBOR.  The terms of the note do not contemplate that LIBOR might be manipulated fraudulently by the various banks that submitted the data from which LIBOR was calculated.  However, Ms. Breer does not seek an adjustment to her deficiency so that it conforms to the terms of her note, with interest rates indexed to LIBOR without the fraud.  Instead, she is attempting to hold the Trustee directly liable for the alleged fraud, which she believes she can connect to the Trustee via BANA, in an effort at avoiding foreclosure and any deficiency altogether.  She argues that BANA's fraud is attributable to its principal, the Trust itself, during the time BANA was the trustee of the Trust.  She therefore argues that the Trust is liable for that fraud to her, has unclean hands, and its current Trustee should not be permitted to foreclose.

The predicate facts for her fraud claim are highly disputed.  Assuming Ms. Breer could establish them, however, Ms. Breer is not entitled to summary judgment and U.S. Bank is.  Ms. Breer argues, in essence, that BANA was the trustee for the Trust at the same time that it was making fraudulent submissions as a LIBOR panel member, and that coincidence of timing is sufficient to hold the Trust liable for BANA's actions.[2]  The detection of some fraud in the banking industry does not inexorably lead to the result Ms. Breer seeks, however.

She is attempting to hold a principal (the Trust) liable for the tort of its agent (BANA).  As the Vermont Supreme Court has explained:

> The test applied by this court . . . is in effect this: The principal is liable for the acts of his agent if committed in the scope of his employment and in furtherance of the principal's business.  In other words, the liability of the principal does not depend upon the character of the act itself or whether it was

---

[2] Ms. Breer never explains why this coincidence of timing should have such a pivotal effect in this case.  Indeed, it is not clear that her legal arguments would be any different if BANA had never been a trustee of the Trust at all.

done during the period of employment, but, rather, on the question of whether it was done to carry out his directions, express or implied, or to effect some purpose of the agent alone.  If the former, the principal is liable; if the latter, he is not liable.

*Greenough v. U.S. Life Ins. Co. of City of New York*, 96 Vt. 47, 52 (1922).  Were the rule otherwise, a principal would always be the guarantor of its agent's conduct, no matter the purpose or scope of the agency or the nature of the agent's misconduct, which essentially is how Ms. Breer is treating the circumstances of this case.

Here, no evidence even remotely implies that anything BANA did as a LIBOR contributor was done in its capacity as trustee for the Trust, for the benefit of the Trust, or bore any meaningful relation whatsoever to its function as a trustee for the Trust once it took on that role after purchasing LaSalle Bank, the original trustee.  If it engaged in any fraud or other tort, there is no evidence that it had anything to do with the Trust, and it is not attributable to it.

Ms. Breer argues that the Trust was liable because somehow there was a ratification of BANA's fraudulent conduct.  "It is a well-established principle of law that, where a person acts for another who accepts the fruits of his efforts, knowing the methods used, the latter must be deemed to have adopted those methods, as he may not, even though innocent of the fraud when committed, receive the benefits thereof, and at the same time disclaim responsibilities for the means by which they arose."  *Jones v. Stearns*, 97 Vt. 37, 42 (1923).  There is no evidence in this case that BANA's fraud, if any, was undertaken for the benefit of the Trust, that the Trust as principal knew "the methods used," or that any benefits were accepted and retained by the Trust with regard to Ms. Breer's loan.

It is unclear what effect BANA's LIBOR submissions, fraudulent or not, actually may have exerted on Ms. Breer's reset rates.  There is no evidence, however, that any such fraud had any connection to BANA's function as trustee for the Trust.  Moreover, Ms. Breer has not even attempted to show that any benefit from the alleged fraud inured to and was retained by the Trust.  Ms. Breer seems to assume that BANA's fraud caused the Trust to receive and retain income from her that it should not have.  The effect of BANA's fraud, she alleges, is that she ended up defaulting on the loan and has made no payments in many years.  If the alleged fraud had that effect on Ms. Breer, it similarly cost the investors with the beneficial interests in the Trust dearly.  It is unclear how they, or the Trust on their behalf, may be said to have retained any benefit in these circumstances.  "Never . . . have we extended responsibility for fraud beyond the context of one party acting on behalf of a cooperative effort between multiple parties." *Madowitz v. Woods at Killington Owners' Ass'n, Inc.*, 2014 VT 21, ¶ 28, 196 Vt. 47.  There is no evidence of any relevant cooperative effort here.

While arguing in favor of class certification, Ms. Breer also argued that WFHMI caused the underlying interest rates to skyrocket by flooding the markets with subprime loans that it knew were destined for default and would destabilize the economy.  It is not clear whether she is pursuing this claim any longer as it not clearly raised in the motions.  In any event, the argument is unsupported by substantial evidence to the extent that it attributes foresight and responsibility for national interest rates and the economy itself largely to WFHMI's conduct alone.

6

In support of summary judgment, Ms. Breer also seeks to establish that U.S. Bank is not a holder in due course. Holder in due course status is not necessary to enforcement of a note. Rather, it limits the obligor's defenses. See *Dernier v. Mortg. Network, Inc.*, 2013 VT 96, ¶ 51, 195 Vt. 113. U.S. Bank is not seeking to limit Ms. Breer's defenses by asserting holder in due course status. The court therefore does not need to address this issue.

*Consumer fraud and unclean hands*

Given the above, it is wholly unclear how Ms. Breer's LIBOR allegations could support a consumer fraud claim against U.S. Bank or an unclean hands defense to foreclosure. Whatever fraud may have been involved in BANA's LIBOR submissions, Ms. Breer has not persuasively explained how that common law fraud may be attributed to U.S. Bank or the Trust when reframed as statutory fraud and unclean hands. She similarly has not explained why seeking foreclosure in the circumstances of this case itself could be considered fraudulent. U.S. Bank is entitled to summary judgment on these issues.

*Assignment of the mortgage*

Ms. Breer argues that U.S. Bank cannot enforce the mortgage because the note and mortgage were severed when WFHMI assigned the mortgage to BANA while BANA was the trustee. WFHMI later attempted to assign the mortgage to U.S. Bank when it was the trustee with a "corrective assignment," but at that time it had no right to assign the mortgage, she argues, having earlier assigned it BANA. The summary judgment record is insufficient to settle the issue of whether U.S. Bank currently has a right to enforce the mortgage.

It has long been settled "that if the debt be assigned, *and there be no agreement to the contrary*, the mortgage, in equity, goes with it." *Keyes v. Wood, Grant & Co.*, 21 Vt. 331, 337–38 (1849) (emphasis added); accord *Island Pond Nat. Bank v. Lacroix*, 104 Vt. 282, 294 (1932) ("In the case of a mortgage securing the payment of a debt, the debt is the principal thing, and the mortgage is an incident of it which accompanies and follows the debt wherever that may be assigned."). This is so because it seldom if ever makes any sense to gratuitously eliminate the availability of security for the debt. "When the right of enforcement of the note and the mortgage are split, the note becomes, as a practical matter, unsecured. This result is economically wasteful and confers an unwarranted windfall on the mortgagor." Restatement (Third) of Property (Mortgages) § 5.4 cmt. a.

While the movement of the note in this case from the loan originator to U.S. Bank is undisputed, neither party has fully traced the movement of the mortgage. After the loan was originated, WFHMI endorsed the Note in blank and assigned it to the Trust. When BANA acquired LaSalle, it became the trustee and holder of the note. U.S. Bank then became, and now is, the trustee and holder of the note.

Generally, the law would anticipate that when the original trustee, LaSalle, became the holder of the note, that it would also have acquired the right to enforce the mortgage, whether by express assignment or operation of law. Neither party has shown whether it did. Instead,

7

WFHMI purported to later assign the mortgage to BANA when BANA was the trustee, and it purported to again assign the mortgage to U.S. Bank when U.S. Bank was the trustee. It could only have accomplished any such assignment if it had something to assign. In other words, Ms. Breer's argument assumes without explanation that LaSalle never acquired the right to enforce the mortgage. If LaSalle did, then BANA presumably also would have in the transaction by which it became the trustee, and U.S. Bank presumably would have in the transaction by which it became the trustee. However, there is no evidence on whether LaSalle acquired the right to enforce the mortgage and what happened to it thereafter as the note passed to the successor trustees. There is only evidence of the two confusing assignments by WFHMI.

A threshold question is posed by Ms. Breer's argument and the absence of evidence in the record. It is whether LaSalle actually acquired the right to the mortgage when it became the holder of the note or there was some agreement by which WFHMI retained an unenforceable right to the mortgage, subsequently assigned it to BANA, and U.S. Bank never acquired any right to enforce it. The court cannot resolve this fact at this time on undisputed facts.

*Summary*

U.S. Bank is entitled to summary judgment on all Ms. Breer's fraud-related claims and defenses. Nonetheless, it is not entitled to summary judgment as to liability on the note and entitlement to foreclosure in reliance on the mortgage. Whether Plaintiff is entitled to enforce the note and mortgage and if so, the amount due, cannot be resolved on summary judgment. A trial will be needed.

ORDER

For the foregoing reasons, Ms. Breer's summary judgment motion is denied; U.S. Bank's summary judgment motion is granted in part as stated above and otherwise denied.

A pretrial status conference will be scheduled.

Dated at Montpelier, Vermont this ____ day of August 2017.

_____
Mary Miles Teachout
Superior Judge

8