*Moorcroft v. Severance*, 169-7-13 Oecv (Harris, J., Mar. 12, 2018)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| SUPERIOR COURT Orange Unit | CIVIL DIVISION Docket No. 169-7-13 Oecv |
|---|---|
| James Moorcroft,     Plaintiff<br><br>v.<br><br>Steve Severance, Barbara Severance, John W. Severance, and all others on the premises,     Defendants | FINDINGS AND ORDER |

This civil action requires the court to analyze and determine the legal relationships between the parties, but in particular between Plaintiff James Moorcroft ("Plaintiff", "Mr. Moorcroft", or "Jim") and Defendant John Severance ("John")[1]. Claims under the Second Amended Complaint and Counterclaim were tried in this case during evidentiary hearings on January 25, 2018 and February 8, 2018. Plaintiff appeared at the hearings pro se. The Defendants, John Severance, Steve Severance ("Steve") and Barbara Severance ("Barbara"), appeared along with their counsel, Attorney Nicolas Burke. After the evidence was closed, the parties submitted post trial briefs, which the court has reviewed and considered.

Based on the admitted testimony and exhibits, post-trial memos, and pertinent pleadings, the court makes the following findings of fact and conclusions of law.

1. James Moorcroft's parents are Shirley Moorcroft ("Shirley") and Arthur Moorcroft ("Arthur").

2. In or around 1995 Jim took title to a 68 acre parcel from Frank Hebert, located in Brookfield, Vermont. (the "Subject Property").

3. The Subject Property is a rural farm parcel roughly bisected in half by a river. It included an older farmhouse, a barn and another outbuilding or two. It contained fields and some woods.

4. Mr. Hebert retained tenant/ extraction rights to a gravel pit located on the Subject Property.

5. In acquiring the Property, Jim obtained some funds from his parents. Details as to funds they provided at the time of the Property's acquisition were not provided.

6. At the time Mr. Moorcroft obtained the Subject Property, it has been the site of a prior Unifirst environmental spill of some kind such that title insurance companies would not issue title insurance policies against the property.

---

[1] The court uses first names, rather than surnames, to refer to the suit parties in this opinion for ease of quick reference. The parties include two Severance brothers.

7. Jim worked in the business of buying and selling cars in Massachusetts. After he acquired the Subject Property, at some point he started to transport the cars intended for re-sale, to the Subject Property, to store them. Cars continued to be stored at the Subject Property for sale for an extended, and undefined, period. It is not clear exactly where and when such cars were placed on the property. As noted, after the parties entered their Life Lease relationship, Mr. Moorcroft bought out Mr. Hebert's gravel pit lease rights and stored cars in the gravel pit area. Eventually (and at present) there were and are as many as 800 vehicles located on the property.

8. Jim continued to buy and sell used cars after acquiring the Subject Property. In or around 1998, Jim met John and John's brother, Steve. Soon thereafter, Steve came to work for Jim as a salesman in what was Jim's car sale business, then known Pride Auto Sales.

9. At this time, John owned a Berlin, Vermont farm. (Note this Berlin farm was not the Subject Property that is part of this dispute).

10. Steve and Jim started to store and sell cars from the Berlin farm property John owned. It is unclear if Jim had also stored cars on the Subject Property during the time Jim stored cars on John's Berlin farm. John also eventually also became involved in selling cars. In any event, John Severance let Jim and Steve run the car sale business from his farm property. After a time the town officials complained about a business being run from the farm property, perhaps because it was not zoned or permitted for such commercial, non-agricultural use.

11. The Pride Auto Sales business moved to the Montpelier-Barre area. It operated out of two successive locations on Route 2 and Route 302 and later became inactive. In these locations (as opposed to the Berlin, Vermont farm property) the Pride Auto business also could operate a repair shop and office.

12. At or around the time that the auto sale business was moved from John's Berlin farm – John sold his Berlin farm. He netted $90,000 or so from the farm property sale.[2] John was looking ideally for someplace where both he and his brother Steve (and Steve's wife, Barbara) could live, but he only had $90,000 or so to spend.

13. Jim was looking for help with his finances at this time. He not only owed his parents money from their financial assistance (or informal loan) when he acquired the Subject Property, but they had given him advances to use in his Pride Auto Sales business.

14. From at least the time Jim acquired the Subject Property, until 2015 or so, Jim's parents, Shirley and Arthur, advanced him funds. Many, but not all, of the advanced funds, were intended for Jim's businesses buying and selling autos (including Pride Auto Sales and the subsequent company Pride Auto East, discussed below).

15. As Jim obtained these advances from his parents, their mutual intent was for Jim to pay Shirley and Arthur back. The advances were intended as loans, not gifts. Jim and his

---

[2] Numbers and figures were frequently referenced by the parties from pure recall and very few claimed figures or payments were backed up by documentary proof. The leniency of the parties' relationship with each other, and with the senior Moorcrofts, make any reasonably accurate accounting of the sums exchanged by the suit parties impossible, even before one undertakes deciding whether contested payments were made, and if so by whom, to whom, for what, and when.

parents understood Jim would pay the lent sums back, although no formal written documents (promissory notes, security agreements, or even receipts) were prepared. It was a situation of "family helping family".

16. At the time the Shirley and Arthur- to Jim advances were being made, those parties did not even keep a running tally sheet of just what was owed. To complicate things Jim would sometimes make payments to his parents – cash, checks or payment of their expenses "in kind" – but no formal tally or records were kept.

17. One thing is clear and undisputed. Jim's rate of informal borrowing from his parents significantly exceeded the rate by which he repaid them. The cumulative balance due grew each year, even if there was no formal sum due or paid reconciliation.

18. At the time John had sold his Berlin farm in 2001 and was looking for ways to solve his and Steve's housing challenge, Jim had amassed at least $200,000 debt to his parents, for his business related and personal informal borrowing.

19. In this setting around and before June 11, 2001, Jim and John; and later Jim, John, Steve Barbara, and Rose Severance ("Rose"), who was John's mother, discussed what came to beknown as their "Life Lease".

20. The concept was pretty straightforward and helped them each solve part of their financial challenges. As Jim colorfully testified at one point, it gave everyone "the best bang for the buck".

21. The concept was the four Severances (John and Steven / Barb as a couple, and Rose) would pay $60,000 to Jim, or on Jim's behalf, so Jim could make progress in repaying his parents the debt he owed them. The Severances in return would not get fee simple to the Subject Property, or any subdivided lot. Instead they would get the right to occupy and use the non-farmhouse portions of the Subject Property in a four-life life estate. Their collective occupancy right would be for their combined lives, with the surviving Severances to retain their occupancy rights until the last of them died.

22. Jim meanwhile would get to use the farmhouse on the land and have a remainderman interest in the whole property. Jim would also become a co-tenant in common for the portions of the property covered by the Severances' life lease (except for residences they placed or put on the land). Jim was simultaneously a remainderman on the property and a co-tenant to the Severences (except as to each of their ownership interests in their residences).

23. By late Spring 2001 Jim and the four Severances had a land instrument, entitled a "Life Lease" drawn up by Attorney William Donahue. John had used Attorney Donahue but everyone knew that in creating the deed that attorney was not representing any one person or one side or the other. He was representing the group and anyone could get a second opinion from their own lawyer.

24. The four page "Life Lease" was signed by Jim and the four Severances on or around June 11, 2001 (the "Life Lease").

25. The Life Lease had several provisions that impact the issues in this case:
   a. The Severances got to use the 68 acres for "residential, agricultural or any other legal use or business" for payment of $60,00 rent for the life estate "lease". (Page 1, Para. 4).

3

**b.** The Severances were credited for $20,000 they had paid Mr. Moorcroft, and for the remaining $40,000 in advance lease payments they were to provide a $40,000 Promissory Note to Shirley and Arthur. (Page 1, Para. 5 and 6). The Parties' Agreement said that "[a]ny breach of said Promissory Note shall not be a breach of the Lease." (Id).

**c.** Mr. Moorcroft got exclusive use of the original residence on the premises and the Severances got exclusive use of any residences they might construct or place on the property (Page 1, Para. 7). As to the open land on the property, Jim had co-extensive (per capita or person) co-tenant use rights with the Severances as if Jim owned an equal co-tenant in common share to the land with them. (Id)

**d.** Mr. Moorcroft and the Severances each paid taxes assessed against their residences. For the common land the Severances paid in proportion – one share per each person. (One fifth each while all four Severances were alive; one fourth each after Rose Severance died). (Page 1, last Paragraph). Jim would be included in this co-tenant count and had to pay his share as if he were a co-tenant. (*Id,* stating Jim as Landlord and the Severances, as surviving Tenants, paid such taxes "in equal fraction")

**e.** Jim, agreed to not mortgage or encumber his interest in the Subject Property, without the Severances' written consent. (Page 2, last sentence)

**f.** The Lease had a section that described the overarching intent that the instrument was meant to give the Severances a life lease and to provide them a place to establish their homes, and to farm and work, and for Jim to continue to have his home on the property, and to in essence have the parties act "as if they were equal co-tenants" while the Severances were alive, except as to special provisions as to their residences. (Page 2, last paragraph)

26. After the Life Lease was signed, the Severances made some improvements as the Life Lease allowed and placed some trailers on the land. The trailers[3] were placed across the river from the farmhouse, on the Subject Property. The pre-trailer improvements, mostly paid for by the Severances, included improving a road, replacing a bridge, constructing wells and septic fields and electric supply lines.

27. At first two trailers were placed – one for John and his mother (Rose) and another for Steve and his wife, Barb. Steve and Barb continue to reside on the Subject Property in their mobile home. As described below, John came to move into Jim's farmhouse, after Rose died and during a brief period when John co-occupied his trailer with Jim. After vacating his trailer, John rented it out to relatives.

28. Later John placed a third trailer on the property, which has been rented out to other relatives.

29. Jim agreed that he received the $20,000 from the Severance called for in the Life Lease.

30. The $40,000 Promissory Note from the four Severances to Shirley and Arthur was prepared and signed by the Severances, and provided to Jim. (Tr. Ex. D). It appears that Shirley either never saw it or by 2018 forgot it had ever been discussed in her presence. The court finds, from the evidence presented, that Shirley (or Arthur) in fact knew of the

---

[3] During the trial, the parties used the terms "trailers" and "mobile homes" interchangeably. The court does the same in this opinion.

$40,000 promissory note from the Severances and tracked at least some of the payments due and made under it while Rose was alive.

31. Tracking the payment history of the Severance-to-Shirley/Arthur Promissory Note is hazy at best.

32. At first, John's mother, Rose, made the $464.63 monthly payments called for in the Note to Shirley. At least 13 payments were made before Rose took ill and finally died in 2004. (Trial Ex. 2D).

33. The post-Life Lease $40,000 Promissory Note payment status becomes murky due to the complex relationship that developed between Jim and John after Rose died, as to their personal, financial and business lives.

34. For purposes of determining if the Severances defaulted on the $40,000 Promissory Note, the court need not make findings. For the reasons stated in the Legal Analysis, the court finds any breach of the Promissory Note created no breach of the Severances' Life Lease obligations, or any other obligations between the parties to this suit.

35. In or around 2002, as Jim and John spent more time together, John was helping Jim with the car sales business.   Jim looked to John to help provide some funding. At one point they sketched out an investment approach – where John would own a percentage. (Tr. Ex. L) Jim says co-ownership was discussed but did not occur.  John gave a more nuanced description. He admitted that "at first" he lent $30,000 or so "as an investor" but claims the relationship became that of a Pride Auto business partnership as his life became intertwined with Jim's life. These matters are discussed in more detail later in the factual findings.

36. By the time Rose died John and Jim had developed a close and personal relationship, that became intimate.  Jim's farmhouse (his residence under the Life Estate instrument) at the time was very rustic – it lacked a workable kitchen.

37. Although the Life Lease left ownership and occupancy of the Severance family trailers in their ownership and uses (during their life estates) – Jim moved into John's trailer on the Subject Property after Rose died. He did this with John's express permission. The two men became intimate and started to share their living space, personal lives and pool their finances as a domestic couple. (The court notes that Jim and John never formalized their relationship into the level of a legal commitment of a civil union or marriage).

38. John and Jim redid the kitchen in Jim's farmhouse, rendering the place more livable, and moved in there together. This was not too long after Rose died.

39. This co-occupancy and consensual shared living arrangement was also something new, and outside the terms of the Life Lease. Under the Life Lease, Jim retained at all times the sole ownership and usage rights to the farmhouse. He chose later to voluntarily allow John to come to co-reside there as an invitee and co-habitant.  Jim and John by their post-Life Lease conduct created a residence occupation relationship different than the rights under the Life Lease.  The importance of this distinction is described later in this opinion.

40. There were about nine more or less good years for Jim and John.  John delivered papers for the *World*, raised some horses (with Jim helping some) and assisted Jim in the Prime Auto venture.  At times John spent most of his working time helping Jim in the auto sales venture(s).  During this time, another "division" of Pride Auto, called Pride Auto East,

was started in Bradford, Vermont. Eventually it replaced Pride Auto Sales, as over time the Pride Auto East business and location was viable, but the Pride Auto Sales was not.

41. During the domestic partnership and shared household years, income earned, from Jim and John's business and other income producing activities, was pooled for the combined living expenses. Jointly pooled and used funds included the Pride Auto Sales income, John's *World* paper route income, John's trailer rental income, John's social security benefits, and presumably any funds Jim got from his parents not immediately spent on the auto sale businesses. It is hard to know what came from who or where or what sums from what sources were used for what. No meaningful financial records of any of this was produced, just fragments and snippets.

42. To make matters more complicated, as of 3/21/06 John became subject to a $107,480 federal tax lien (Exhibit 25). It appears John also by this time was not supposed to be earning income to be eligible for his social security benefits he was receiving. The IRS would be on the hunt for John's *World* newspaper route earnings, and any pay for work he did helping in the auto sales. John's income sources were commingled into Jim's and/or Pride Auto bank accounts. The court finds a significant motivating factor for John to do this was to defraud or deter IRS collection efforts, and/or conceal his income that might affect his SSI benefits. While the domestic "partnership" relationship was in effect, Jim knowingly helped John shield such assets.

43. John introduced one document by which he tracks about $30,000 in payments for things he made on behalf of Pride Auto Sales (and/or Pride Auto East) – Tr. Ex N. The document is not self explanatory as to whether these expenditures (assuming they were made, for those business(es), which the court credits) were intended as loans or equity capital contributions when made.

44. John testified "at first" as he made $30,000 in payments he believed it was as a loan, but he came to consider it an investment. He does not describe any express discussion or agreement between he and Jim to that effect. Jim denies anything like that occurred.

45. John clearly for a time acted as the lead sales guy or operations manager for the Pride Auto dealership and became known as the "face" of the business. He also was given signatory power on the company's bank accounts. This does not necessarily mean John was also a business <u>owner</u>. John claims he never got compensated, but Jim says John received several payments for autos "off the books" as cash, and tacitly kept those funds (with Jim's knowledge) as payment for John's services.

46. Moreover, John and Jim had their domestic relationship at that time, by which they were commingling their financial assets across all fronts while they lived together. As part of this arrangement they often deposited checks or sums for each other in one or more Pride Auto, or other personal, bank accounts. Their personal accounts became commingled with the Pride Auto business accounts.

47. Jim and John worked together to help Jim evade loss of his state auto sale dealership license rights. Pride Auto was operated in a series of locations, and then lost its licensed auto dealer seller status from the State of Vermont. Vermont has licensing requirements, to lawfully sell vehicles as a car dealer. Pride Auto was not able to maintain those requirements.

6

48. Car sales continued out of "John's Repair Shop" businesses that John set up as sole proprietorships. As Jim and John were involved in selling cars, the vehicles were titled, for sales and registration transfer purposes, through various individuals, relatives and former Auto Pride employees as the cars were sold to individuals. Neither Jim nor John had a state auto dealer license and the volume of cars they individually or collectively sold would have normally required a state dealer license. By using "straw" sellers they knowingly evaded state licensing requirements.

49. The evidence was unclear if John's Repair Shop was a true sole proprietorship that John ran, allowing Jim to also sell cars from that location, or if it was operated as some joint business between John and Jim that was part of the Pride Auto businesses. No earnings information, or tax filings of any sort for that business were provided.

50. The May 2008 Ruel / John's Repair Shop lease for 689 South Barre Road in South Barre, was solely between John (as John's Repair Shop) and Richard Ruel and was in John's own name (Exhibit 9B). This is more consistent with John's Repair Shop business being John's own sole proprietorship, as Jim claims, rather than part of a Pride Auto business partnership.

51. The 5/3/07 Environmental Court order, from the Town of Brookfield proceedings to require the Pride Auto cars be removed, was against Mr. Moorcroft alone as an individual (Exhibit D). This is consistent with the Pride Auto businesses being a sole proprietorship. However, the 2009 Pride Auto River Street, Montpelier lease termination proceedings and judgment proceeded against John Severance personally (See Exhibit 24). No copy of that operative lease was presented. The court cannot tell as to who and how it was executed insofar as the named lessee. The admitted exhibits included a small claims court action complaint NAPA Auto brought against Pride Auto, in small claims court, wherein the Plaintiff described John Severance as the Pride Auto owner. (Exhibit 22). It is unclear what statements or conduct served as the basis for the Plaintiff's contentions.

52. The Pride Auto business entities in issue, according to Jim, filed Schedule C sole proprietorship tax returns in Jim's name, but none were produced at trial. To the extent John claims the Pride Auto business(es) was (or were) a partnership (or partnerships) for many years, he admits he never saw any tax returns or partnership Schedule K-1's of any kind indicating he (John) had an ownership interest in the businesses.

53. John appears to ask the court to infer he and Jim had a true business partnership by the mere fact John provided services for the auto sales ventures, income from those ventures was used from Jim and John's shared household while they lived together as an intimate domestic partnership, and he had made some initial payments (loans or investments) of about $30,000. There was never any alleged express discussion between Jim and John wherein they agreed to share the income and losses of the Pride Auto businesses.

54. The sharing and pooling of assets between Jim and John appears to have arisen from their intimate domestic partnership. This "partnership" was one by which they shared income and expenses of their household and lives during the time they sustained relations as intimates or *domestic* "partners". This is a different "partnership" than a business general partnership. (See Legal Analysis below)

55. John's claim he and Jim were Pride Auto business partners is not sufficiently proven. There must be a "meeting of the minds" to form a partnership. A partnership, if formed, includes an agreement to share both profits <u>and losses</u>. There is no indication John ever discussed with Jim, or agreed himself, to share in responsibility for future losses of the Pride Auto sales businesses, and to do so regardless of the status (and any termination) of their intimate, interpersonal domestic relationship. It is one thing to pool income and earnings (and jointly get by in lean times), and share expenses for an intimate couple as part of their close interpersonal and household relationship while that intimate relationship exists. It is a further step to expressly agree that income earned, and long term debts taken on by one of the intimates, will continue to be the personally held property or debt of the <u>other</u> intimate after the interpersonal relationship ends.

56. Even for married persons, spouse A may own a business and pool his or her business income with spouse B as the marriage continues and the couple lives together. Spouse B may even help work in the business and be paid for his or her labors. That does not equate to those spouses having a meeting of the minds that Spouse B is now a legal co-owner of spouse A's business. More is needed. More than what is shown here.

57. Moreover, the evidence showed no discussion or understanding between John and Jim, that although they each devoted differing time and made some advances, and received some income from, the Pride Auto business activity, that they had any discussion or agreement to be co-equal business owners of the business enterprise. If John claims he and Jim were "partners", there was no discussion as to what ownership interest each might be agreed to have achieved (by labor and/or capital contribution).

58. As noted above, the court does not find that Jim and John had such a meeting of the minds or agreement so as to elevate their indefinite, but terminable, household income/asset and debt pooling arrangement (their "domestic partnership") into a general business partnership.

59. John and Jim's income pooling arrangement was not just gratuitous behavior on John's behalf to solely benefit Jim. John and his family members had the Promissory Note responsibility, arising out of the Life Lease, to make payments to Shirley and Arthur. Some of the sums accumulated in the Jim-John household were paid to Shirley for those purposes, by cash or payments in kind such as helping pay her and Arthur's taxes. John got co-possession and use to the farmhouse (as to which co-habitation and use he had no rights under the Life Lease), and in effect was paying "rent" by virtue of the income pooling arrangement with Jim. The domestic relationship income pooling conduct let John shield his income from the IRS and his employment earnings from the SSA. In turn, John's "John's Repair Shop" helped Jim evade Vermont car dealer licensing scrutiny as Jim tried to sell off the stock of autos stored on the Subject Property.

60. In viewing the Pride Auto business entities, as the court notes later, it is surprising that John has brought a counterclaim to declare the businesses general partnerships in which he owns one half.

61. The Pride Auto businesses have a large unpaid creditor – Shirley and Arthur. Although Shirley's annual summary of sums paid to her son (Exhibit 18) combines payments by Shirley and Arthur to Jim for both *personal* and *business* expense advancement, a

8

significant portion of the advanced sums were used for the Pride Auto businesses. Back up documentation for Shirley's summaries was only given for 2006, but even in that single year it is clear she made significant, still unpaid, advances for Pride Auto equipment and expenses. Exhibit 19 shows over $50,000 in readily recognizable Pride Auto expense advances by Shirley in 2006, and there might be several more Pride Auto-related advances in that year if the Exhibit 19 entries had been fully explained. As the sums Shirley and Arthur are owed are not part of this suit, the issue was not explored and is not relevant as to the issues between the suit parties. As noted in the Legal Analysis section below, even if a general partnership were found, Pride Auto *creditors* would be paid at liquidation (including judicial dissolution) before the partnership's *partners*.

62. To the extent John might claim general partner status in the Pride Auto businesses, he cannot disclaim knowing about the business advances Shirley continued to make. John testified that he knew about those Pride Auto advances and cautioned Shirley against making them. Yet John did not protest to the extent such advances fueled the finances of the businesses in which he claims a one half partner ownership interest (see Legal Analysis) .

63. The court finds that John has failed to prove by a preponderance that he had any partnership interest in the Pride Auto businesses ventures or businesses. To the extent John might have made loans to Jim and the companies, John has not asserted those claims in his counterclaim to recover such loans. The loan repayments status thus remains unresolved – see Legal Analysis section.

64. Although the Life Lease precluded Jim from allowing liens against the Subject Property, in 2005 and 2009 he gave mortgages to his parents which were recorded. The mortgages refer to promissory notes but none were signed (or if signed, none were ever introduced into evidence). The recorded mortgages recite sums owed by Jim to his parents of $150,000 (Exhibit E, Mortgage from 3/28/05) and later $208,815.96 (Exhibit F from 10/28/06). Per Shirley's loose accounting of sums she was owed from her son (Exhibit 18), she and Arthur were owed $230,659 at the end of 2004 and $244,499 by the end of 2005.

65. These mortgages secured prior, lawfully owed unsecured debt owed to the senior Moorcrofts, but the grant of the mortgages without consent of the Severances violated the Life Lease. Jim may have granted these mortgages, not to get the upper hand as to the Severances, but to ward off Prime Auto or personal creditors who might be after Jim to collect sums he owed as a sole proprietor of the Pride Auto businesses.

66. Jim did not get the Severances advance written consent before giving the mortgages, contrary to the Life Lease.

67. As of the dates the Mortgages were given and recorded, Jim had previously executed the Life Lease to the Severances and it was recorded. When the Mortgages were granted, the Severances had prior perfected conveyed life estates in the Subject Property, that Jim had conveyed away in 2001. Thus the 2005 and 2006 mortgages only encumbered Jim's portion of the Subject Property that he had not conveyed away in 2001. They do not directly encumber, and are subject to, the Severances' Life Lease joint life estate interests.

68. In 2015, at the time the Severances sought a status quo order from the court prohibiting any party from encumbering or trying to convey assets – Jim prepared a UCC Financing Statement in favor of his parents and had it filed on 6/28/15 with the Vermont Secretary of State's Office. No written document conveying a security interest in any of the described personal property collateral was shown to have been signed at that time.

69. This 2015 activity was likely done by Jim in an effort to "beat out" any formal order ordering a status quo or to deter forfeiture or restitution proceedings that might flow from criminal proceedings being pursued against Jim at that time. The Severances filed their status quo motion on 3/26/15. Between the filing of the motion and the court's grant of it in July 2015 Jim's counsel had sequential requests to withdraw. It is not clear if the motion to preserve status quo was forwarded to Jim by his then counsel of record.

70. The issues presented in this case, as to the Life Lease and the Parties' use and occupancy of the Subject Property, require further findings in the latter developments in the domestic relationship between Jim and John.

71. The household had certain strains. Money was tight, John developed a back disability. There were incidents of domestic abuse committed by both domestic partners. Each man sought one or more relief from abuse orders ("RFA") against the other. In one 2013 incident Jim displayed a gun, after Jim says he feared for his safety from John. John got a final RFA order in that incident. There was a stay away RFA order entered against Jim, but Jim could communicate with John by texts during that time.

72. Jim started to spend time at Shirley and Arthur's Connecticut home around this time (2013). His father was ill, and Jim got a UPS truck driver job. Although not expressly stated, it appears these events occurred at a time when under the RFA Jim likely had to leave the household where John was living.

73. It might at first appear strange Jim at that time was not, or could not, reside in the farmhouse which under the Life Lease was the residence reserved for his sole occupancy and use. This was not however due to the Life Lease's terms. It was due to subsequent volitional acts and decisions – the voluntary and consensual commencement of the farmhouse co-habitation by Jim and John. The 2013 RFA issuance against Jim at a time when John was able to truthfully state the farmhouse was serving as his lawful residence (He had taken up residence there by permission – see Legal Analysis below).

74. By in or around 2015, the RFA lapsed and Jim made efforts to be restored to possession of the farmhouse. This lawsuit was pending by then, but the pleadings included no claim to evict John from the farmhouse.

75. The close and personal relationship between Jim and John ended in or around 2013 as the RFA went into effect. Jim made some requests of John to vacate the farmhouse, but John rebuffed them.

76. During 2013 and thereafter Jim made some trips to the residence to attend to his largely moribund car sales business. Jim had inventory and equipment stored at the Subject Property. He was working as a UPS driver in Connecticut and it appears that the Pride Auto East venture was not that active. (None of the parties provided the court with any records or figures as to any of the Pride Auto businesses actual or purported earnings for any time period).

10

77. In or around 2015, Jim again demanded that John vacate the farmhouse. John refused and told Jim he had changed the locks and that Jim had to stay away. Since that comment Jim did not go to the police, or amend his pleadings in this case.

78. For about a six-month period in 2015 Jim served time in a federal work camp, serving time for a federal conviction involving the sale and/or transport of stolen vehicles. John was questioned, but never charged with a crime from those incidents, indicating John had no active co-involvement in the illegal activity. It is unclear if the criminal charges related to Pride Auto-related activities by Jim, but that is probably likely. No evidence on that topic was introduced.

79. The payment and non payment of real estate taxes due against the Subject Property is complicated. Once again the Parties threw around rough figures, and apart from some historic tax bills received by Jim and a one page summary referenced below – no records of sums actually paid or not paid, or balances claimed due by the Town or tax sale announcements, were provided to the court.

80. Only snippets of the actual tax bill status may be derived from the evidence as the parties presented their evidence.

81. The Life Lease was recorded in the town and the $60,000 consideration paid was noted and a Vermont Property Transfer Tax return was filed. From that point there were two sets of owners of taxable portions of the fee interest with in the Subject Property. First there was Jim. He owned the farmhouse outright, and (after Rose died), a one fifth (formerly one sixth) interest in the open land and non-residential property improvements. He also had ownership (subject to the Severances' life estates) of the remainderman portion of the property (apart from his residence) and any structures the Severances did not remove during their life estate. It appears that the permanent improvements the Severances made to the trailer sites (road improvements; bridges; septic; water) were tax assessed as some of the non-homestead part of the property on Jim's tax bills. It appears the tax bills sent to Jim listed everything on the land except the mobile homes the Severances added. (See Ex.16).

82. The Severances brought mobile homes onto the Subject Property. It appears (although no tax bills were admitted to this effect) that the Severances were taxed by the town for their ownership of the mobile homes they placed on the Subject Property.

83. There are two aspects to this taxation situation. First the Town sent two separate tax bills, to the two sets of owners with an interest in the Subject Property – one to Jim for the farmhouse homestead and land/non mobile home buildings; the second to the Severances (for the mobile homes). The second aspect is that strictly speaking the Town did not precisely allocate the taxable fee simple in the property to the precise real interests deeded or conveyed by Jim to the Severances under the Life Lease. Under the Life Lease, while one of them was alive, the Severances were responsible for 4/5th (5/6ths when Rose was alive) of the open land and/outbuildings' taxes on the Subject Property, as they had a real interest (their life estates) in the Subject Property, not just ownership of three mobile homes.

84. The Severances paid some (but not all) of their mobile home taxes. As to their contributions to the 4/5ths of the non-homestead land shown on Jim's bill – it appears the

Parties did not communicate. The non-mobile home portion of the Subject Property tax bill got in serious arrears. How "bad" things got and when the court cannot say.

85. Jim submitted his tax bills (Tr. Ex. 16), showing the taxes due (but not any payments) for each year, and his summary as to the Severance's portion of each year's 5/6th or 4/5th "pro rata" share for each year (Tr. Ex. 5). He claims those sums were not paid and are owed to him.

86. No tax billing records were introduced other than the raw tax bills (Tr. Ex. 16), and a one page town summary "Delinquent Tax Report" (Ex. Q, page 2), attached to the Severances' August 2017 Delinquent Tax Payment Agreement (Ex. Q). That summary report shows claimed taxes not paid in the years 2003 - 2017 with taxes, interest and penalties totaling $38,096.34 as of August 2017.

87. This Ex. Q, page 2 is the only shard of a town-produced record that reflects Subject Property taxes that were unpaid. It shows overdue and unpaid taxes for many years from 2003 to 2017. This town record shows no delinquent taxes for the tax years 2004, 2005, 2007, 2010, 2011 and 2012. Yet Jim claims he is owed Severance tax contributions for those years for unpaid taxes. (See Ex. 5)

88. The court concludes while Jim's exhibit shows the facial proportionate tax responsibilities of the parties each year, it does not accurately reflect credits for taxes actually paid, which is the nub of the issue.

89. As to the delinquent tax agreement noted above, the Severance brothers signed a Delinquent Tax Payment Agreement with the town in August, 2017 (Ex. Q), to start paying $250/month on that sum. The Town soon made it clear that it was not going to forego any back due tax sale remedies it had available to it. The Severances made a payment or two and stopped.

90. To complicate things, Jim did not pay many of the tax bills due for his portion of taxable interest in the Subject Property under the Life Lease. Jim (and John) could not say what parts Jim paid or did not pay. This makes it even harder to divine from Ex. Q, page 2 who might be responsible for what.

91. The court can say that the tax arrearages on overdue tax bills and notices Jim received were the combined failings and breaches of both Jim and the Severances to fully pay the portions of the tax bill each had agreed to pay under the Life Lease. There is a failure of proof to allocate their respective responsibility for the unpaid sums. To assign sums due as between the parties on the state of the evidence would require mere speculation by the court.

92. At present the unpaid taxes are a looming problem. A tax sale could occur.

93. The Subject Property has other aspects that may impede a tax sale. This may explain why the Town has let an overdue property tax bill of $25,000 or more lay dormant for a decade.

94. There are about 800 unregistered vehicles stored on the property. They have been there for many years now. The ANR and Town (through environmental division court proceedings) have sought or obtained orders as to their removal.

95. The parties ask the court to assume the vehicles have value and can be sold to be hauled away. It is unclear if these aging vehicles and their removal, may leave any oil or

gasoline spills or other environmental clean up issues. Photos of these vehicles show several that are obviously badly damaged. (Defendant's Ex. I). A recent ANR notice of violation (undated), that followed a 2017 site visit declared the car storage area an unpermitted salvage yard and gave Jim and the Severances notice they needed to start removing the cars or take other steps so the property does not meet the definition of a salvage yard. The ANR gave the respondents until 12/1/17 to make a written response. No evidence of any kind of response was given. All the parties to the Life Lease might face an ANR enforcement action as to the cars.

96. The Subject Property had a prior environmental cleanup issue. Part of the reason Jim enlisted his parent's aid to buy the parcel is because that due to that history, none of the title insurance companies would write a title insurance policy against the property. To the extent the property serves as an auto graveyard, versus an active auto sales dealership lot, the environmental land contamination problem worsens with time.

97. John developed a list of the Pride-related business equipment located at the site (and a few things at Jim's parent's house in Connecticut) and his claimed used / present fair market value prices for the items. (Tr. Ex. R). He lists about $134,000 in value for many items and $150,000 for the estimated 800 "junk cars". The court addresses that further in the Legal Analysis section below

98. In 2013 – 2015 Steve and John were embroiled in town tax sales issues. Jim helped them draft a response to the town, acting for the Severances. During the peak of that action, Jim asked to be paid for his work, and went to Steve's mobile home to ask for payment. Jim was commanded to leave under harsh language from Steve.

**Legal Analysis**

The Amended Complaint

The court starts with the claims made by Jim under the Amended Counterclaim. To align with the court's analysis of the Parties' legal relationships and rights and obligations, the counts are discussed out of turn.

1. <u>Count 2 – Rent</u>

Jim claims the Severances failed to pay the $40,000 Promissory Note to Shirley and Arthur, and such non-payment is a breach of the Life Lease's rent obligations that he may recover in this action.

Jim lacks standing to pursue any alleged breach of the Promissory Note. The Life Lease expressly states that "[a]ny breach of said Promissory Note shall not be a breach of the [Life] Lease. Ex. A, at Page 1). When looking at a real estate instrument such as a deed, the court must accept the plain meaning of the language the parties have chosen and not look to other construction aids if that language is not ambiguous. *Kipp v. Estate of Chipps*, 1689 Vt. 102, 107 (1999); *LeBlanc v. Snelgrove*, 2015 VT 112, Para. 30, 200 Vt. 570. The Life Lease is unambiguous that non-payment of the Promissory Note does not violate the Life Lease.

Similar results occur if contract interpretation principles are applied. In interpreting a contract the court looks to the intent of the parties as it is expressed in their writing. *Prue v. Royer*, 2013 VT 12, ¶ 20, 193 Vt. 267; *Southwick v. City of Rutland*, 2011 VT 53, ¶ 4, 190 Vt. 106. Where the contract is unambiguous it controls that interpretation. *Id.* The conclusion that non-payment of the Promissory Note does not violate the Life Lease is not contrary to the expressed intent of the parties to the Life Lease. Jim still received the full $60,000 in consideration for the Life Lease from the Severances. Twenty thousand was paid in cash. The next $40,000 was provided by delivery of an enforceable promissory note delivered to Jim to provide Shirley and Arthur for sums Jim owed them.

2. Count 1 – Ejectment

Mr. Moorcroft seeks to eject the all three of the Severances by foreclosing their interests in the Subject Property under the Life Lease document. To analyze this claim, the court notes that there are two sets of legal relationships between Jim and the Severances – [a] Jim's relationship with John as to Jim's residence, and [b] Jim's relationship with all of the Severances created by the Life Lease.

### a. *Ejectment of John Severance form Mr. Morecroft's Residence*

As described in the findings, John's claim of right to the possession of Mr. Morecroft's residence is not found in the Life Lease. It expressly stated that residence was under the sole possessory, and dominion and control, rights held by Jim. If no other events had occurred, John would be a mere trespasser in the Morecroft Residence.

Subsequent (post Life Lease execution) events did occur. Those events created a new legal relationship between Jim and John that overlaid their prior Life Lease relationship. John came to co-habit and live with Jim, in Jim's residence, for an indefinite time, with both parties knowledge and intent that the Morecroft Residence become John's place of residence, even if he held no title to the home. The court cannot find whether any payment of rent, by cash payment or "in kind" contributions by John on Jim's behalf, was discussed when the two men started their consensual co-occupation of the home. Their domestic partnership, and sharing of income, described in the factual findings, did provide Jim consideration for John's occupation of the residence.

14

The court finds that Jim and John had a relationship of landlord and tenant covered under the Vermont Residential Rental Agreement Act ("VRRAA"), 9 V.S.A. § 4451 *et seq.* The VRRAA applies to "rental agreements" which are means "all agreements, written or oral, embodying terms and conditions concerning the use and occupancy of a dwelling unit and premises" § 4451(8). A "'dwelling unit' means a building or the part of a building that is used as a home, residence, or sleeping place by one or more persons who maintain a household" § 4451(3).

Once John's RFA against Jim expired, and John receive an order to extend the "no contact" provisions, Jim had the right to return to the home and resume occupancy there. The court finds that John's verbal refusals to allow access, and conduct in changing locks, violated John's duties to Jim under the VRRAA (both as Jim's co-tenant, and to Jim as the VRRAA landlord) and provided good cause to terminate the tenancy.

However the VRRAA requires a person in the position of a landlord to provide at least 30 days' written notice to vacate, *even for breaches of a rental agreement for material breach.* See V.S.A. section 4467(b)(1). While Jim made reference to various requests he made to John to vacate the property, since the RFA expired, no proof of any written termination notice was attached to his complaint (12 V.S.A. section 4852), or introduced into evidence at trial.

Jim's request to eject or evict John from Mr. Moorcroft's residence is denied at present. Jim may seek to evict John after he gives an appropriate written notice of termination and waits the required period. After those steps are done the court will allow him to amend his complaint to show such notice has been given as to his oral VRRAA "rental agreement" with John Severance. See 12 V.S.A. section 4852.

b. *Ejectment of the Severances from the Subject Property under the Life Lea*se

The court next considers Mr. Moorcroft's request to eject the Severance due to their legal relationship created under the Life Lease.

To the extent the Life Lease document provides the Severances with life estate interests in the Subject Property, and Mr. Moorcroft a remainderman interest, the issue would be if a remainderman interest holder of property may eject a life estate interest holder from the property

for violations of the life estate conditions. The court could not find any recent cases on this issue, but an old case has recognized that a remainderman may bring a common law ejectment action against the life estate holder for some breaches. See *Olcott v. Dunklee*, 16 Vt. 478 (1844). Here, as noted in the factual findings the court finds the Severances have breached some of their duties under the Life Lease document. They have failed to pay their portion of the taxes against the Subject Property, although the court cannot determine what taxes are due (or more precisely what portion of unpaid town taxes are the responsibility of the Severances under the Life Lease).

However, as also discussed in the factual findings, under the Life Lease, the parties had another relationship created by the instrument – that of tenants in common in possession of the land. (The court separately treats the issue of John's co-possession of the Moorcroft farm residence, analyzed in Part a above). As to the rest of the common property of the Subject Property, the court finds that the parties have shared use and possession of the property (with the Severance-placed trailers to be possessed by them or their tenants as the Life Lease allows). There is insufficient evidence of ouster or adverse possession of the Subject Property as to one set of tenants in common against the other. To the extent the property taxes were not paid, it appears that the Severances are responsible for more of the overdue balance owed to the Town than Mr. Moorcroft, but the court cannot determine who owes what. However, if Mr. Moorcroft's Life Lease breach claim against the Severances is that for claimed back taxes, to the extent the parties' relationship is that of tenants in common, the appropriate remedy to seek to collect a co-tenant's unpaid portion of taxes or property carrying expenses is through an accounting. See 12 V.S.A. section 4251(1); *Holmes v. Best*, 58 Vt. 547 (1886). Co-tenants do not get to oust or eject each other over the issue of unpaid taxes.

The court must decide whether Mr. Moorcroft is entitled to claim a right to ejection under his remainderman interest (against the Severances' life estates) - or instead - a right for an accounting, in Mr. Moorcroft's role as a co-tenant in common. To do this, the court has to consider the nature of the Life Lease instrument.

As the court has noted in its findings, and above, the instrument creates different simultaneous relationships between the parties. In deciding what remedy may be available for non-payment of taxes, the Life Lease prescribes the respective responsibilities of the parties, but

has no express terms stating what happens between the parties if the property-related expenses and obligations are not followed.

The court turns to deed or real estate instrument principles of construction:

> When construing a deed or other written agreement, the "master rule" is that the intent of the parties governs. *Kipp v. Chips Estate,* 169 Vt. 102, 105, 732 A.2d 127, 129 (1999) (internal quotations omitted). In discerning the intent of the parties, the court must consider the deed as a whole and give effect to every part contained therein to arrive at a consistent, harmonious meaning, if possible. *Id.* The court may consider "limited extrinsic evidence of 'circumstances surrounding the making of the agreement' in determining whether the writing is ambiguous," which is a question of law subject to de novo review. *Id.* at 107, 732 A.2d at 131 (quoting *Isbrandtsen v. N. Branch Corp.,* 150 Vt. 575, 579, 556 A.2d 81, 84 (1988)). Ambiguity exists if the extrinsic evidence, in combination with the writing, "supports an interpretation that is different from that reached on the basis of the writing alone, and both are reasonable." *Id.* If the court determines that a writing is not ambiguous, the plain meaning of the language controls without resort to rules of construction or extrinsic evidence. *Id.* On the other hand, if the court determines that the writing is ambiguous, interpretation of the parties' intent becomes a question of fact to be determined based on all of the evidence—not only the language of the written instrument, but also evidence concerning its subject matter, its purpose at the time it was executed, and the situations of the parties. *Mann v. Levin,* 2004 VT 100, ¶ 17, 177 Vt. 261, 861 A.2d 1138.

> *Main Street Landing, LLC v. Lake Street Association, Inc*., 2006 VT 13, ¶ 7, 179 Vt. 583, 584-85.

Because the Life Lease instrument's language does not address remedies for the breach of tax payments, the court looks to the instrument of the whole and the circumstances surrounding its execution. The last paragraph of the Life Lease's page summarizes the "intent of this document" as providing the Severances a life lease, but also to provide them real property "on which to establish domiciles, and to farm, and to otherwise work", while allowing Mr. Moorcroft to continue his domicile on the same property. The clause also states the intent of the parties was to "provide the Landlord and the Tenants with dominion and control over the premises as if they were all equal co-tenants", except for their private residences. The Life Lease allowed the Severances to make improvements to the Subject Property and "build" personal residences on the property, and not only live there, but also conduct farming and their own business on the property, while allowing Mr. Moorcroft parallel joint use of all non-residence portions of the Subject Property. ("Landlord reserves the right . . . [to] exercise dominion and control over the entire premises [except Tenants' residences that may be built] as if Landlord and the surviving Tenants each owned equal shares")(Life Lease, Page 1. Third to last paragraph). At the time the Life Lease was executed, Jim sought to obtain funds to pay his parents, and the Severances were looking for a place to live. In forging their agreement, the parties negotiated a relationship by which they shared use of the land except for their private residences.

17

The court finds the predominant feature of the Life Lease, when one seeks to determine how it applies to remedies for nonpayment of taxes, is the parties' relationship as co- tenants in common. Co-responsibility for taxes is a common feature of tenancy and is a day-to-day property expenses obligation inferred by law when it is not specifically provided for in the instrument that creates such a relationship. The court does not find that the parties would have intended for the Severances to be subject to the harsh penalty of an equitable ejection – and loss of their co-tenancy rights and life estates- for any breach in their tax share payment obligations.

Moreover, to allow such an equitable remedy to Mr. Moorcroft in this situation would not be equitable. He has breached the Life Lease too. He has not fully paid his share of the taxes. He has mortgaged the property (twice) in violation of the Life Lease terms.

The court thus declines to order an equitable ejectment of the Severances from the Subject Property. While the court finds Mr. Moorcroft could seek an accounting and order for back payment of taxes, the court declines that at this time for two reasons. First Mr. Moorcroft did not seek such a remedy in his current amended complaint. Second, he has provided insufficient evidence for the court to make any findings on the sum of the taxes currently unpaid by the Severances. In any equitable damage accounting, while the court can order payments of sums and enter judgements to require such payments, in doing so the court must determine the sums due. To obtain a damage award a party must provide sufficient evidence to allow the fact finder to estimate damages with "reasonable certainty." *Lemnah v. American Breeders Serv., Inc.,* 144 Vt. 568, 580 (1984); *Madowitz v. Woods at Killington Owners' Ass'n, Inc.,* 2014 VT 21, ¶ 14, 196 Vt. 47. See Restatement (Second) of Contracts § 352 (1981) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."). Damages cannot be based on mere "speculation and conjecture." *Pinewood Manor, Inc. v. Vt. Agency of Transp.,* 164 Vt. 312, 318 (1995).

### 3. Count 3 – Anticipatory Breach of the Lease

Mr. Moorcroft claims anticipatory breach of contract by Severances as to the Life Lease. The contract doctrine of anticipatory breach of contract is also known as repudiation, as the "more familiar and contemporary contract doctrine". *Record v. Kempe*, 2007 VT 39, Para 15, 182 Vt. 17.

As the *Record* Court stated:

When one party repudiates a contract, the other party is discharged from her duties under the contract and may bring an action for breach. See *Lowe v. Beaty,* 145 Vt. 215, 218, 485 A.2d 1255, 1257 (1984) ("A repudiation before the time for performance constitutes an anticipatory breach of the agreement."); Restatement (Second) of Contracts § 253 (1981). A party repudiates a contract when that party explicitly or implicitly represents that he cannot or will not perform his obligations under the contract. This can be accomplished by either:

> (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach ..., [or]
> (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

> Restatement (Second) of Contracts § 250. Implicit repudiation is also referred to as "apparent impossibility." See, e.g., Restatement (Second) of Contracts § 250, cmt. c. ("[A] party's act must be both voluntary and affirmative, and must make it actually or apparently impossible for him to perform.").

*Record v. Kempe*, 2007 VT 39, at Para 15. Here the Severances have not made affirmative statements that they wish to intentionally breach their taxpayment obligation. Their non-payment may be the result in part of financial inability to pay, not conscious voluntary acts to render themselves unable to pay.

The court finds it unnecessary to analyze the full import of the repudiation doctrine as to the non payment of taxes under the Life Lease. Repudiation is a contract doctrine. Here, the parties tax payment obligations flow not from a contract, but their co-tenancy as tenants in common. That relationship is not "repudiated" by non-payment of taxes, a carrying cost of the property subject to the tenancy in common. Tenants in common have a more complex legal relationship, tied to the land held, than parties to a contract. Tenants in common hold by unity of possession, each having separate and distinct title and freehold, and each being solely and separately seised of his share. *Northeast Petroleum Corp. of N.H., Inc. v. State, Agency of Transportation*, 143 Vt. 339, 342 (1983).

The court declines to apply the doctrine of anticipatory breach of contract or repudiation to the parties to this lawsuit.

4.  Count 4 – Breach of the Implied Covenant of Good Faith and Fair Dealing.

In Count 4, Mr. Moorcroft seeks recovery under the theory of breach of the implied convent of good faith and fair dealing. The covenant of good faith and fair dealing is implied in every contract. *Harsch Props., Inc. v. Nicholas,* 2007 VT 70, ¶ 14, 182 Vt. 196, 932 A.2d 1045. "It is an implied promise that protects against conduct which violates community standards of 'decency, fairness or reasonableness.' " *Id.* (quoting *Carmichael v. Adirondack Bottled Gas Corp. of Vt.,* 161 Vt. 200, 209, 635 A.2d 1211, 1216 (1993)). He looks to treat the Life Lease as a contract and contends the implied covenant was breached by John and/or Steve "initiating numerous altercations" as Mr. Moorcroft sought payments under the Life Lease and by not paying taxes and rent due under the Life Lease.

These claims fail for a few reasons. As to the claim for unpaid rent, the court has determined none was owed under the Life Lease as the full "rent" consideration was provided at the Life Lease's inception. The court does not find that the mere nonpayment of real estate taxes,

19

while a breach of the Life Lease shows a violation of the implied covenant. It is a mere Life Lease contract term.

Moreover, the claimed unpaid rent and taxes are the core of Mr. Moorcroft's breach of Life Lease contract claims. "A breach for violation of the implied covenant may form a separate cause of action than for breach of contract, as long as the counts are based on different conduct." *Id.*; *see also Monahan v. GMAC Mortg. Corp.,* 2005 VT 110, ¶ 54 n.5, 179 Vt. 167, 893 A.2d 298 ("[W]e will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract *based upon the same conduct").* Mr. Moorcroft has attempted to do that here.

As to the alleged "numerous altercations" the court finds that there was some mutual domestic abuse between John and Jim, and Jim was the one who, after hearing, was subjected to final relief form abuse order. John's non-turnover of Jim's farmhouse, although wrongful, derives from their former domestic partnership and continuously remained readily correctable had Jim simply filed an eviction action, as discussed above in this opinion, and as available to him. As to alleged conduct of Steve, - apart from the Jim/Steve verbal altercation when Jim sought to collect payment for helping the Severances on the town tax sale matter – the court heard no evidence of Jim/ Steve altercations.

The Counter Claim

The court next addresses the John Severance Counterclaims. In his counterclaims John claims he and Jim operated Pride Auto, Pride Auto East and Rainbow Acres Belgian as general partnerships, and asks to declare those business as general partnerships and order a wind up of those partnerships. In the amended counterclaim he adds in the claim that if the businesses are not partnerships, they should be wound down as part of the domestic partnership Jim and John maintained from about 2004 to 2013 and be wound down like a partnership.

There was no significant proof as to Rainbow Acres Belgian and any claim as to the existence of a partnership for that business must be denied. It was mentioned in passing at trial but no evidence about its formation, operations or business was offered.

As to the claim for declaration that Pride Auto and Pride Auto East were operated as general partnerships, the court rejects the claim under the factual findings described above. In essence the court declines to find a partnership as there never was a meeting of the minds to operate the businesses as co-owners. An essential element of a business partnership is an agreement among the parties to share in the profits and losses of the venture. *Mislosky v. Wilhelm,* 130 Vt. 63, 68 (1971), citing *Sheldon v. Little,* 111 Vt. 301, 304, 305, 15 A.2d 574; *Farmers' Exchange v. Brown,*106 Vt. 65, 67, 169 A. 906. An agreement to share losses in particular was lacking in Jim and John's relationship as to Pride Auto and Pride Auto East.

As intimated in the factual findings, if John was afforded partner status, he would likely be in a worse situation then he faces as a non-partner with some unpaid advances to Jim. If the Pride Auto entities were general partnerships Jim's acceptance of business operations funds advances to the partnership by Shirley, to be paid back to Shirley, would bind those partnerships. 11 V.S.A. section 3221. In a 11 V.S.A. section 3271(5) judicially ordered dissolution (or any general partnership dissolution), the assets of the partnership, including contributions of the partners, must first be applied to discharge obligations to creditors. Section 3277. Thus if the

Pride Auto entities were partnerships, the hard assets of the entities would be sold by bulk auction or other reasonable means to pay Shirley and Arthur first, not the partners.  If Shirley and Arthur's debt owed was fully supported, it is likely that a court-ordered liquidation sale would leave a balance still owing  Shirley and Arthur after distribution of sale proceeds. To the extent the alleged partnerships might have partnership creditor claims not paid from the assets dissolution sale, and not subject to statute of limitations defenses, if John was one of the general partners, he could be personally sued by Arthur and Shirley for any recoverable net balance owed them. 11 V.S.A. section 3226(a).

As to John's claim that he is entitled to a wind down as the result of the parties' "domestic partnership", he cites no legal authority for the court to treat John and Jim's former intimate, close relationship as the equivalent of a marriage and declare a property distribution. Civil unions became legal in Vermont in 2000, followed by legal same sex marriage in 2009. These provisions, for Jim and John to obtain the privileges and protections of marriage, were never entered into between the parties. As they chose not to enter such a relationship, with its rights and privileges to have property ownership equitably decreed in a manner different than how property is legally held, the court will not undergo that task for them.  See *Dexter v. Corliss,* 2006 WL 4959623, Docket 245-12-03 Oecv (Teachout, J.) (stating unmarried parties  are "not entitled to the equitable division of property that would be available to [them] in a divorce").  As Judge Morris stated in another case denying such relief:

> The parties never married or entered into civil union. Vermont does not recognize common law marriage, nor does either party assert that in fact or law that that was their status. Vermont is not a community property jurisdiction, as may relate to the winding up of a long term cohabiting relationship in which parties may have pooled resources. Principles of equitable distribution attendant upon dissolution of marriage or civil union are of no application here. Cf. 15 VSA § 751.
> In the presenting circumstances, the Court has no authority to simply conduct an accounting of the parties' financial history and make distribution upon termination of their relationship, in the absence of Plaintiff's establishment of a claim that is otherwise cognizable and sustained upon the credible evidence presented.

*Gaboriault v. Pearson*, 2006 WL 4959279, Docket No. 7-1-04 Cacv (Morris, J)

Even if the court tried to untangle between Jim and John who might owe what to whom, the evidence was too fragmented to make much sense out of their various transactions. It appears their on and off the books financial interminglings included efforts to thwart or divert creditors, taxing authorities, the Social Security Administration, and state auto sale licensing authorities; and were further tempered by the Life Lease, the other Severances' co-use of the property, and sums owed by the Severances to Jim's parents.

To the extent John now might claim he was an investor status and wants to sue for a balance owed him, he has not done so to date. He will not be allowed to amend his pleadings, after trial, to assert such status. Like Jim, John chose and limited the legal claims he was asserting in this case to those asserted in his pleadings. John may bring any new action, subject to applicable defenses, to seek to prove and recover for any claimed investment loans provided.

## CONCLUSION AND ORDER

In the discussion and analysis above the court has determined the parties claims asserted against each other, based on their pleadings, the evidence presented, and applying the law.

By separate judgment, the court enters judgment for Defendants, and dismisses all claims of James Moorcroft asserted in the last amended complaint against Steven Severance, Barb Severance and John Severance EXCEPT:

a.  James Moorcroft may issue and serve a written notice of termination on John Severance, as to the Moorcroft farmhouse residence on the Subject Property, and file an amended complaint to seek to evict John Severance from that residence; and;

b.  If he chooses, James Moorcroft may file a new separate action for an accounting against the Severances as to their tenancy in common under the Life Lease.

By separate Judgment the court enters judgment for Plaintiff, and dismisses the claims of John Severance against James Moorcroft, for a declaratory judgment that they had entered a partnership and/or that John Severance was entitled to obtain court orders for a judicial dissolution of the alleged partnerships between James Moorcroft and John Severance.

The court notes its decision here leaves many unresolved issues between the parties under the Life Lease. The Severances may bring an accounting, in a separate action against James Moorcroft as to their tenancy in common under the Life Lease. John Severance may seek to bring actions against James Moorcroft, for alleged loans, subject to defenses that Mr. Moorcroft might raise, as any such claims were not raised by the pleadings or litigated here – only the partnership counterclaim. The court is making no orders, in this action, requiring any sale or removal of the cars stored on the Subject Property. The Severances have not sought it and whether they may require it has not been litigated here. The court is making no orders, in this action, requiring any discharge of the Mortgages against the Subject Property. The Severances have not sought such relief and whether they may require it has not been litigated.


_____

Michael J. Harris
Superior Court Judge


_____

Victoria N. Weiss
Assistant Judge


Hon. Joyce McKeeman
Assistant Judge

22