Filed 03/28/24

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| DUSTIN MOORE, on behalf of himself and all others similarly situated,<br>  Plaintiff<br><br>v.<br><br>NORTHCOUNTRY FEDERAL CREDIT UNION,<br>  Defendant | Docket No. 23-CV-2844 |

RULING ON DEFENDANT'S MOTION TO DISMISS

Plaintiff Dustin Moore brings this class action for breach of contract, bad faith, and consumer fraud against Defendant NorthCountry Federal Credit Union. Plaintiff alleges that NorthCountry unlawfully assesses overdraft fees and nonsufficient funds fees on certain of his debit card transactions. He also seeks to represent a class of others similarly situated. NorthCountry moves to dismiss for lack of subject matter jurisdiction and failure to state a claim.

I. Alleged Facts

The court must assume for purposes of this motion that the facts asserted in the complaint (unless clearly contradicted by the documents attached) are true. The facts as alleged by Moore are as follows. Plaintiff Moore is a Vermont citizen and Morristown resident and has maintained a checking account at NorthCountry. NorthCountry is a credit union with nearly $900 million in assets. It is engaged in the business of providing retail banking services throughout Vermont. Plaintiff alleges that NorthCountry has illegally assessed $25 overdraft fees in two distinct ways: (1) on debit card transactions

authorized on sufficient funds (Count 1); and (2) by imposing multiple fees on one item (Count 2).[1]

The debit card transactions at issue here[2] occur in two parts. First, the merchant instantaneously obtains authorization for the purchase amount from NorthCountry. When a customer swipes their debit card (either physically or virtually), the card terminal connects via an intermediary to NorthCountry, which verifies that the customer's account is valid and that sufficient funds exist to cover the transaction amount. If the transaction is approved, Moore alleges that NorthCountry immediately freezes the funds in the customer's account by the amount of the transaction, but does not yet transfer the funds to the merchant. Sometime thereafter, the transaction "settles" and NorthCountry actually transfers the funds to the merchant's account. NorthCountry decides whether to pay debit card transactions at authorization. Thus, once it has authorized a transaction, it cannot later refuse to pay the merchant, regardless of subsequent account activity.

Plaintiff's first theory is that NorthCountry improperly assesses fees on transactions that were authorized when sufficient funds were in the account to cover the transaction, but that then settle at a later date when the account is in a negative balance. This is the so-called "Authorize Positive, Settle Negative" (or "APSN") theory. Moore asserts that the moment a debit card transaction is authorized on an account with positive funds to cover the transaction, NorthCountry's practice is to immediately reduce the consumer's checking account for the amount of the purchase, set aside funds in the

---

[1] Plaintiff also initially alleged that NorthCountry illegally charged overdraft fees on transactions that did not overdraw the account (the so-called "sufficient funds" theory) (Count 3), but he has since dropped that claim. *See* Pl.'s Opp'n at 1 n.2.

[2] NorthCountry notes that there are other debit transactions that are paid immediately at the time of the transaction. Those types of debits are not at issue here.

checking account to cover that transaction, and adjust the consumer's displayed "available balance" to reflect that subtracted amount. Thus, a customer's account will always have sufficient funds available to cover these transactions. Despite this, NorthCountry still later assesses overdraft fees on many such transactions when they settle days later into a negative balance. NorthCountry assessed fees on Plaintiff's APSN transactions on December 19, 2019, April 22, 2020, and June 5, 2020. Compl. ¶ 67.

Plaintiff's second theory is his "multiple fees" theory. He alleges that, under the contract, NorthCountry promised that no more than one fee would be assessed "per item," and that a particular "item" must mean "all iterations of the same instruction for payment." Compl. ¶ 93. Plaintiff alleges that NorthCountry has breached the contract by charging multiple fees per item. Unbeknownst to consumers, when NorthCountry reprocesses an attempted payment after it was initially rejected for insufficient funds, it chooses to treat it as a new and unique item that is subject to another fee. For example, on June 21, 2021, Plaintiff attempted a payment. NorthCountry rejected that payment due to insufficient funds and charged Plaintiff a $25 fee. The next day, unbeknownst to Plaintiff and without Plaintiff's request to reprocess the item, NorthCountry processed the item for a second time, rejected the item again and charged Plaintiff a second $25 fee for doing so.[3]

Plaintiff claims that through the practices described above, NorthCountry breached the contract and the covenant of good faith and fair dealing, and violated Vermont's Consumer Protection Act.

---

[3] When NorthCountry assessed fees on Plaintiff, the fees were $25. Compl. ¶ 88 n.2. According to the fee schedule, they are now $15. Ex. B.

3

## II.    The Contract

Plaintiff filed a copy of his credit union "Membership and Account Agreement" along with the complaint. Ex. A. "Where pleadings rely upon outside documents, those documents 'merge[] into the pleadings and the court may properly consider [them] under a Rule 12(b)(6) motion to dismiss.'" Davis v. American Legion, Dep't of Vermont, 2014 VT 134, ¶ 13, 198 Vt. 204 (quoting Kaplan v. Morgan Stanley & Co., 2009 VT 78, ¶ 10 n. 4, 186 Vt. 605 (mem.)). As to overdraft fees, the contract provides:

> If, on any day, the available balance in your share or deposit account is not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. . . . Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

Membership and Account Agreement § 14(a). The contract goes on to explain how different types of transactions are posted to the account, including "signature-based debit card purchase transactions," which are "purchase transactions using your debit card that are processed through a signature-based network." Id. § 14(b). The contract provides:

> Merchants may seek authorization for these types of transactions. The authorization request places a hold on funds in your account when the authorization is completed. This is referred to as an "authorization hold". An authorization hold will reduce your available balance by the amount authorized but will not affect your actual balance. The transaction is subsequently processed by the merchant and submitted to us for payment. This can happen hours or sometimes days after the transaction, depending on the merchant and its payment processor. These payment requests are received in real time throughout the day and are posted to your account when they are received.

4

The amount of an authorization hold may differ from the actual payment because the final transaction amount may not yet be known to the merchant when you present your card for payment. For example, if you use your debit card at a restaurant, a hold will be placed in an amount equal to the bill presented to you; but when the transaction posts, it will include any tip that you may have added to the bill. This may also be the case where you present your debit card for payment at gas stations, hotels and certain other retail establishments. We cannot control how much a merchant asks us to authorize, or when a merchant submits a transaction for payment.

For debit card transactions involving merchant authorization holds, there may be a delay between the hold being applied and the transaction posting to your account. During the delay, intervening transactions may impact the available balance in your account. It is important to keep in mind that we check your available balance both at the time the merchant's authorization request is received and again when the transaction settles and posts to your account. If your available balance is insufficient to cover the amount of the merchant's authorization request, we will decline the request. If your available balance is sufficient to cover the merchant's authorization request, the request will be approved, and an authorization hold in the amount of the request will be placed on your account. The transaction will be subsequently processed by the merchant and submitted to us for payment. If the transaction settles and posts to your account at a time when the available balance is insufficient to pay the transaction without causing an overdraft (i.e., posting the transaction results in an available balance of less than $0), we will charge you a fee for overdrawing your account, even though the available balance in your account was sufficient to cover the transaction at the time it was authorized.

Id. The contract then provides an example to "illustrate[] how this works":

Assume your actual and available balances are both $40, and you use your debit card at a restaurant to pay your bill totaling $30. If the restaurant requests authorization in the amount of $30, an authorization hold is placed on $30 in your account. Your available balance is only $10, but the actual balance remains $40. Before the restaurant charge is sent to us for payment, a check that you wrote for $40 is presented for payment. Because your available balance is only $10 due to the $30 authorization hold, your account will be overdrawn

by $30 when the check transaction is posted to your account even though your actual balance is $40. In this example, if we pay the $40 check in accordance with our standard overdraft services, we will charge you a fee for overdrawing your account as disclosed in the Schedule of Fees and Charges. The fee will also be deducted from your account, further increasing the overdrawn amount. In addition, when the restaurant charge is finally submitted to us for payment, we will release the authorization hold and pay the transaction amount to the restaurant. The transaction amount may be $30 or a different amount (for example, if you added a tip). Because the amount of the restaurant charge exceeds your available balance at the time the charge is settled (i.e., at the time the merchant or its financial institution requests payment or the transaction posts to your account), we will charge you another fee for overdrawing your account, even though you had a sufficient available balance in your account at the time the restaurant charge was authorized and approved.

Id.

## III. Discussion

### Overdraft Fees Assessed on Pre-Authorized Debit Card Transactions

A motion to dismiss under Rule 12(b)(6) is proper "only when it is beyond doubt that there exist no facts or circumstances that would entitle [the plaintiff] to relief." Montague v. Hundred Acre Homestead, LLC, 2019 VT 16, ¶ 10, 209 Vt. 514 (quotation omitted). Here, NorthCountry's motion does not meet that high standard. A contract is ambiguous when two conflicting provisions cannot be reconciled by reading the contract as a whole. Beldock v. VWSD, LLC, 2023 VT 35, ¶ 40.

Plaintiff claims that NorthCountry illegally assessed fees for what he calls "Authorize Positive, Settle Negative" ("APSN") transactions. These are debit card transactions that were authorized when the account had positive funds to cover the transaction, but that settle days later into a negative balance. NorthCountry contends that the contract's language—including the lengthy example quoted above—unambiguously

6

states that it can charge overdraft fees for such transactions. Plaintiff argues that the contract is ambiguous because it also provides that, for such transactions, NorthCountry puts a hold on the account in the amount of the merchant's authorization request, which reduces the available balance by the amount authorized. Thus, Plaintiff contends, there will always be sufficient funds to pay such transactions because NorthCountry freezes those funds so they cannot be used for other purposes.

NorthCountry argues that no funds are ever frozen for payment to the pre-authorized merchant, so that two overdraft fees can occur as in the examples here. However, the contract expressly states that "[t]he authorization request *places a hold* on funds in your account when the authorization is completed." Membership and Account Agreement § 14(b) (emphasis added). A reasonable interpretation of that language is exactly what Moore argues: that those funds are set aside, or frozen, to pay the pre-authorized charge when it comes in. This creates an ambiguity in the agreement.

Caselaw supports this conclusion.[4] *See, e.g.,* <u>Varga v. Am. Airlines Fed. Credit Union</u>, 2020 WL 8881747, at *4 (C.D. Cal. Dec. 1, 2020) ("While it is clear that a consumer must have funds to 'pay any withdrawal order,' a consumer could still think there was a sufficient amount in the account if there were positive funds when [the credit union] placed a preauthorization hold on the funds – as that seems to be the very purpose of the hold.") (citation and emphasis omitted); <u>Lloyd v. Navy Fed. Credit Union</u>, 2018 WL 1757609, at *8 (S.D. Cal. Apr. 12, 2018) ("As Plaintiffs observe, if a temporary hold lasts until the transaction posts, then their previously posted ATM withdrawals could not consume funds sequestered from positive funds."); <u>Lamoureux v. Trustco Bank</u>, 592 F.

---

[4] Some of the decisions refer to the APSN transactions as APPSN, or "Authorize Positive, Purportedly Settle Negative" transactions."

Supp. 3d 14, 30 (N.D.N.Y. 2022) ("However, based on the provision as a whole, it is reasonable for Plaintiff to assume that, if the debit hold is placed on funds at the time of authorization and settled within three days (i.e., when the funds have not yet been re-released into the account), there is no need for an OD fee."); Precision Roofing of N. Fla. Inc. v. CenterState Bank, 2021 WL 3036354, at *2 (M.D. Fla. Feb. 22, 2021) ("In this case, Plaintiff sets forth a reasonable interpretation of the Terms and Conditions that would preclude Defendant from assessing overdraft charges on APPSN transactions. . . . The language in other sections of the Terms and Conditions regarding how Defendant processes debit holds and imposes non-sufficient funds fees and overdraft fees arguably supports such an interpretation."); Raja Aznir v. Marion and Polk Schools Credit Union D/B/A MAPS Credit Union, No. 21CV04664, slip copy at 3–7 (Cir. Ct. Or. Aug. 20, 2021) (Ex. 3A, Att. 3).

The cases cited by NorthCountry are not persuasive. *See* Mot. to Dismiss at 19–20. Three of its cases discuss the order of payment of transactions but make no reference to authorization holds. *See* Hassler v. Sovereign Bank, 644 F. Supp. 2d 509, 516 (D.N.J. 2009); Gay v. Peoples Bank, 2015 WL 3650090 (N.C. Super. Ct. June 10, 2015); Parrish v. Arvest Bank, 717 F. App'x 756, 760 (10th Cir. 2017). In McCollam v. Sunflower Bank, N.A., 598 F. Supp. 3d 1104, 1113 (D. Colo. 2022), the court concluded that there was nothing in the contract that could "reasonably interpreted to require that the funds on hold be sequestered," but this court does not agree that a "hold" does not suggest that. In Boone v. MB Fin. Bank, N.A., 375 F. Supp. 3d 987, 993 (N.D. Ill. 2019), the court found it significant that "the Overdraft Page fails to make any reference to a debit-card transaction or 'debit holds.'" This court does not find the section in which the "hold" language appears to be determinative at this stage of the case.

8

A reasonable consumer would likely read the contract as not permitting overdraft fees for APSN transactions where the amount of funds placed "on hold" is equal to the final settled amount of the transaction. If the funds on hold are not used to pay that transaction, then what is the point of the authorization hold? *See* Lamoureux, 592 F. Supp. 3d at 30 ("'The Court finds that this is a reasonable interpretation of the Contract, especially considering the Federal Reserve Board has stated that the entire point of the hold is to ensure that the funds remain available to settle the transaction.'") (quoting Darty v. Scott Credit Union, No. 19-L-0793 (Cir. Ct. Ill., St. Clair Cnty. June 24, 2020)). NorthCountry seems to admit as much in its memorandum: "An authorization hold serves a simple purpose: it prevents members from spending the same dollar twice. Without an authorization hold that *reduces* the available funds that can be spent, and stays on the account until the merchant seeks payment, the member could keep using his account and spending the same money over and over again." Def.'s Reply at 13–14 (emphasis added). Moreover, the contract's example expressly provides that such holds remain in effect until the merchant seeks payment: "In addition, when the [] charge is finally submitted to us for payment, we will release the authorization hold and pay the transaction amount to the [merchant]." Membership and Account Agreement § 14(b). NorthCountry argues that the addition of a restaurant tip might lead to a different final charge. That may be, but it does not explain why the same treatment should apply to charges that do not involve any add-on such as that.

### Multiple Fees Assessed on an Item

Plaintiff alleges that, under the contract, NorthCountry promised that no more than one fee would be assessed per item, and that a particular "item" must mean "all iterations of the same instruction for payment." Compl. ¶ 93. Plaintiff alleges that

NorthCountry has breached the contract by charging multiple fees per item. He asserts that unbeknownst to consumers, when NorthCountry reprocesses an attempted payment after it was initially rejected for insufficient funds, it chooses to treat it as a new and unique item that is subject to another fee.

Plaintiff relies on the fee schedule, which provides that the "Overdraft NSF Fee" is "$15 *per item.*" Ex. B (emphasis added). Plaintiff's argument that "per item" means that only a single fee can be assessed on an item, however, runs contrary to the plain language of the contract. The membership agreement explicitly provides: "We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item." Ex. A, § 14(a). Thus, the contract makes clear that NorthCountry can charge a fee each time the same transaction is submitted or resubmitted for payment. Other courts have found similar contract language unambiguous. *See*, *e.g,* Stubbs v. Spire Credit Union, No. 62-CV-22-2282, 2023 WL 1460269, at *6 (Minn. Dist. Ct. Jan. 31, 2023) ("the language in the parties' agreement is clear that Spire may charge a fee each time an item is submitted by a merchant for payment and that an item may incur a fee each time a merchant 'retried' to request payment for an item"); Thompson v. Mun. Credit Union, No. 21-CV-7600 (LJL), 2022 WL 2717303, at *8 (S.D.N.Y. July 13, 2022) ("The Contract here explicitly permits Defendant to charge a fee 'each time' the request is presented."); Saunders v. Y-12 Fed. Credit Union, No. E202000046COAR3CV, 2020 WL 6499558, at *5 (Tenn. Ct. App. Nov. 5, 2020) ("the Contract specifically provides that a fee may be charged for each *overdraft*") (emphasis in original).

However, the contract is ambiguous in one important respect: it does not specify who must submit (or resubmit) the item for payment. *See* Petrey v. Visions Fed. Credit

Union, No. 320CV1147MADML, 2021 WL 2364971, at *4 (N.D.N.Y. June 9, 2021) ("The Agreement does not state that an NSF fee may be assessed when a debit item is *presented for payment by a merchant*, as Defendant would like the Court to believe. The Agreement simply states "[i]f . . . a debit item is presented." Thus, whether the term "presented" refers to presentment by the merchant or by the accountholder is unclear.") (citation omitted) (emphasis in original); Richard v. Glens Falls Nat'l Bank, No. 120CV00734BKSDJS, 2021 WL 810218, at *13 (N.D.N.Y. Mar. 3, 2021) ("Nor does the Account Agreement otherwise contain a clear warning that a payment request submitted by a third party, unauthorized by the account-holder, may trigger a NSF Fee . . . . [T]he [] Agreement is ambiguous as to whether a third party's second or third re-presentation of a transaction that an account-holder authorized only once constitutes a new 'item' that could trigger a separate NSF Fee."); Chambers v. HSBC Bank USA, N.A., No. 19 CIV. 10436 (ER), 2020 WL 7261155, at *3-4 (S.D.N.Y. Dec. 10, 2020) (finding plausible plaintiff's interpretation that "item" means "payments that follow an *accountholder's affirmative instruction for payment*, as opposed to a merchant's attempt to collect on that payment") (emphasis added); Roy v. ESL Fed. Credit Union, No. 19-CV-6122-FPG, 2020 WL 5849297, at *8 (W.D.N.Y. Sept. 30, 2020) ("'item' could reasonably refer to an original, customer-authorized transaction, which, no matter how many times it is resubmitted, is still the same transaction. 'Each item' would therefore refer to a single transaction and could only incur one fee"); Coleman v. Alaska USA Fed. Credit Union, No. 3:19-CV-0229-HRH, 2020 WL 1866261, at *4 (D. Alaska Apr. 14, 2020) (finding it "plausible that a member could have expected to only be charged one NSF fee when she only gave one authorization for an ACH transaction, no matter how many times the merchant presented the transaction for payment"); Williams

11

v. Travis Credit Union, No. FCS054738, slip copy at 6 (Solano Cnty. Cal. Super. Ct. Oct. 14, 2020) (Ex. 3B, Attachment 50).

While the contract plainly allows NorthCountry to assess a fee when a transaction is submitted for payment and an additional fee each time that same transaction is resubmitted for payment, it is unclear whether the accountholder or the merchant must submit the payment request. NorthCountry maintains that it is "unnecessary . . . to explicitly state that it must be the merchant that is presenting the item for payment because it is implicitly understood." Reply at 16. Most banking customers, however, are not intimately aware of the behind-the-scenes details of a debit transaction. A reasonable consumer could easily conclude that the provision allowing fees for multiple payment requests refers merely to the *consumer* authorizing subsequent payment attempts. Moreover, NorthCountry could easily have remedied this ambiguity by writing in the contract that it could charge a fee each time "a merchant" submits or resubmits an item for payment. Given this ambiguity, the court must deny the motion to dismiss this breach of contract claim.

### Covenant of Good Faith and Fair Dealing

NorthCountry seeks dismissal of the claims for breach of the covenant of good faith and fair dealing. At the pleading stage of a case, "[u]nder our liberal pleading rules, a party can present inconsistent claims and demand relief in the alternative or of several different types." Abatiell Assocs., P.C. v. Nicholas, No. 2009-339, 2010 WL 1265841, at *2 (Vt. Apr. 1, 2010) (citing V.R.C.P. 8(a); Spaulding v. Cahill, 146 Vt. 386, 389 (1985)); *accord*, Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012) ("it is accepted practice to pursue [inconsistent] theories at the pleading stage"); Columbia Cas. Co. v. 3M Co., 814 N.W.2d 33, 37–38 (Minn. Ct. App. 2012) (under rule similar to V.R.C.P. 8, "a party can

12

plead alternative or inconsistent theories even though the substantive law precludes double recovery").

However, Plaintiff does not plead separate causes of action for breach of the covenant of good faith and fair dealing. He instead asserts such claims as part of his two contract claims. Complaint ¶¶ 142–46, 154–58. This mixes contract and tort claims together, and bases both claims on the same facts. *See* Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 54 n. 5, 179 Vt. 167 ("Plaintiffs correctly point out that their second cause of action for the breach of the implied covenant of good faith and fair dealing is one sounding in tort."). "'Where a party alleges both breach of contract and breach of the implied covenant of good faith and fair dealing, dual causes of action are permitted only where the different actions are premised on different conduct. . . .'" Beldock v. VWSD, LLC, 2023 VT 35, ¶ 53 (quoting Tanzer v. MyWebGrocer, 2018 VT 124, ¶ 33, 209 Vt. 244). Because the bad faith claims here are based on the same conduct as the breach of contract claims, they fail.

Vermont Consumer Protection Act

Vermont's Consumer Protection Act prohibits "unfair or deceptive acts or practices in commerce . . . ." 9 V.S.A. § 2453(a). "To sustain a consumer-protection claim, a plaintiff must (1) prove facts that meet the definition of an unfair or deceptive act under 9 V.S.A. § 2453(a), and (2) demonstrate the prerequisites to a private action under 9 V.S.A. § 2461(b)." Mansfield v. Heilmann, Ekman, Cooley & Gagnon, Inc., 2023 VT 47, ¶ 32 (citing Dernier v. Mortg. Network, Inc., 2013 VT 96, ¶ 56, 195 Vt. 113).

To establish a "deceptive act or practice" under the Act requires three elements: "(1) there must be a representation, omission, or practice likely to mislead consumers; (2) the consumer must be interpreting the message reasonably under the circumstances; and

13

(3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision regarding the product." Madowitz v. Woods at Killington Owners' Ass'n, Inc., 2014 VT 21, ¶ 23, 196 Vt. 47 (citing Carter v. Gugliuzzi, 168 Vt. 48, 56 (1998)).

"To maintain a private action under § 2461(b), a plaintiff must show either (1) reliance on a deceptive act in contracting for goods or services or (2) damages or injury from an unfair or deceptive act." Mansfield, 2023 VT 47, ¶ 34. For reliance claims, "no actual injury is required." Id. For damages claims, "a plaintiff must prove causation and injury." Id. (citation omitted).

Plaintiff alleges that the assessment of fees on APSN transactions and multiple fees on an item are unfair and deceptive practices under the Act because they are likely to mislead reasonable consumers about NorthCountry's actual fee assessment practice, and that this misleading effect is likely to affect the consumer's conduct or decisions regarding how they use their checking accounts. Compl. ¶¶ 176–78. Given that the contract itself is ambiguous and arguably misleading as to how fees will be assessed for APSN transactions and when multiple fees will be assessed, the consumer fraud claim is sufficient to survive a motion to dismiss.

NorthCountry contends that it never engaged in unfair or deceptive fee practices. It argues that Plaintiff's consumer fraud claim merely restates his breach of contract claims, and that because it did not breach the contract, it also cannot be liable for consumer fraud. Mot. to Dismiss at 29–30; Reply at 19–20. As the court concluded above, however, the contract claims survive the motion to dismiss.

NorthCountry also contends that Plaintiff's claims (and specifically the consumer fraud claim) are preempted by the federal Truth in Savings Act because they essentially amount to a claim that NorthCountry failed to disclose its practices. "There are three main

14

situations in which federal law can preempt state law: express preemption; field preemption; and conflict preemption." In re Investigation into Regul. Of Voice Over Internet Protocol Servs., 2013 VT 23, ¶ 14, 193 Vt. 439. The Court explains:

> Express preemption occurs when a federal statute explicitly reveals congressional intent to preempt state law. In addition, federal law can implicitly preempt state law. Field preemption occurs when the federal regulatory scheme is so pervasive as to make no room for concurrent state regulation. Conflict preemption arises when there is no federal law to wholly supplant state regulation, but the specific state law obfuscates the purpose or objectives of a federal law.

Id. (citations omitted). "There is a presumption that the power of the state has not been superseded by a federal act, and [t]he party seeking to overcome this presumption bears a heavy burden." Id. (quotation and citations omitted).

NorthCountry does not explain what type of preemption it is relying upon. It points to no specific language of any federal law that applies here. Instead, NorthCountry relies on Monson v. Capital Credit Union, which found preemption because the claims all "directly deal[t] with a perceived failure to disclose, the specific language used in the disclosure, or the fairness of the fee practice itself." 2023 WL 4174471, at *5 (N.D. Dist. Ct. Apr. 06, 2023) (quotation omitted). The basis for that conclusion was a federal regulation saying that federal credit unions may determine their fees and charges, and that "[s]tate laws regulating such activities are not applicable to federal credit unions." 12 C.F.R. § 701.35(c). However, that does not mean that all state laws that touch on these issues in any way are preempted. Perhaps a statute saying that only $5 overdraft fees could be imposed would be preempted, but that does not mean that a state consumer fraud law is necessarily preempted.

As the Monson court itself recognized, "'true breach of contract and affirmative misrepresentation claims are not federally preempted, even if the results of those claims

15

may affect a federal credit union's fee disclosures.'" Monson, 2023 WL 4174471, at *3 (quoting Lambert v. Navy Fed. Credit Union, 2019 WL 3843064, at *2 (E.D. Va. Aug. 14, 2019)); *see also*, *e.g.*, Gutierrez v. Wells Fargo Bank, NA, 704 F.3d 712, 726 (9th Cir. 2012) (finding that the plaintiff's claims "based on Wells Fargo's misleading statements about its posting method" under the fraudulent prong of California's Unfair Competition Law were not preempted because that law "does not impose disclosure requirements but merely prohibits statements that are likely to mislead the public"); Whittington v. Mobiloil Fed. Credit Union, 2017 WL 6988193, at *10–11 (E.D. Tex. Sept. 14, 2017) (claim alleging that a credit union affirmatively misrepresented that it assesses overdraft fees only when a customer has overdrawn his or her account not preempted); White v. Wachovia Bank, N.A., 563 F. Supp. 2d 1358, 1367–68 (N.D. Ga. 2008) (finding no preemption of claim brought under state consumer protection statute where plaintiffs claimed that the bank "charged overdraft fees when there was actually money in the account sufficient to pay their drafts").

Here, at the pleading stage, Moore's Consumer Protection Act claim can be reasonably read as alleging misleading statements about its fee practices—rather than a mere failure to disclose its practices—that would not be preempted by federal law. Thus, the consumer protection claim survives the motion to dismiss.

NorthCountry further contends that members can "easily avoid" such fees if they track their spending, read the membership agreement, or speak to a NorthCountry representative, and that they are "free to close their accounts at any time." Mot. to Dismiss at 29. None of these things are elements of a Consumer Protection Act claim, however, and given that the membership agreement is ambiguous, it is not clear how reading the

agreement would help. In any event, none of that would excuse NorthCountry's alleged violation of the Act.

## IV.    Order

NorthCountry's motion to dismiss is granted as to the breach of covenant claims and denied as to the breach of contract and Consumer Protection Act claims. NorthCountry shall file an Answer within 21 days, and the parties shall submit a proposed discovery schedule (including briefing on the issue of class certification) within 30 days thereafter.

Electronically signed on March 28, 2024 pursuant to V.R.E.F. 9(d).

_____
Helen M. Toor
Superior Court Judge